Lucinda G. DETRICK, as Personal Representative of the Estate of Eric C. Detrick, Appellant,

v.

MIDWEST PIPE & STEEL, INC., Appellee.

No. 92A03–9111–CV–338.

Court of Appeals of Indiana, Third District.

Sept. 8, 1992.

John C. Theisen, Gallucci, Hopkins & Theisen, P.C., Fort Wayne, for appellant.

Gary J. Rickner, David R. Steiner, Barrett & McNagny, Fort Wayne, for appellee.

STATON, Judge.

Lucinda Detrick, as personal representative of the estate of Eric Detrick, appeals the summary judgment granted to Midwest Pipe & Steel, Inc. on all counts of Detrick's wrongful death complaint. Detrick presents five issues for our review:

   I.  Whether the trial court erred in determining as a matter of law that truck driver Robert Shaw was an independent contractor rather than an employee of Midwest Pipe.

  II.  Whether the trial court erroneously granted summary judgment to Midwest Pipe on Detrick's estoppel claim.

 III.  Whether the trial court erroneously granted summary judgment to Midwest Pipe on Detrick's claim of vicarious liability under Interstate Commerce Commission regulations.

 IV.  Whether the trial court erred in determining as a matter of law that Midwest Trucking was not controlled as the instrumentality of Midwest Pipe.

  V.  Whether the trial court erroneously granted summary judgment to Midwest Pipe on Detrick's claim that Midwest Pipe negligently employed Midwest Trucking and Shaw.

We affirm the grant of summary judgment as to the ICC regulations and negligence counts; we reverse the grant of summary judgment as to the remaining counts.

Eric Detrick died on May 23, 1989, as a result of a collision involving Detrick's automobile and a semi tractor-trailer driven by Robert Shaw. The collision occurred when Shaw disregarded a stop sign while consulting his road map. The tractor-trailer, owned by Midwest Trucking, Inc., was loaded with cargo from Midwest Pipe, a steel distributor. No intrastate or interstate commerce operating authority permit was possessed by the driver, Midwest Trucking or Midwest Pipe.

On September 20, 1989, Lucinda Detrick filed a complaint against Midwest Trucking, Inc. Subsequently, she amended the complaint to include Shaw and Midwest Pipe as co-defendants. Cross-motions for summary judgment were filed; on July 8, 1991, hearing was held on all pending motions. On July 26 and August 16, 1991, the trial court granted partial summary judgment against Shaw and Midwest Trucking. On August 19, 1991, the court granted summary judgment in favor of Midwest Pipe on all claims against it.

On an appeal from a summary judgment, we apply the same standard applicable in the trial court. *Malachowski v. Bank One, Indianapolis* (1992), Ind., 590 N.E.2d 559, 562. We must determine whether the record reveals a genuine issue of material fact and whether the trial court correctly applied the law. *Shuamber v. Henderson* (1991), Ind., 579 N.E.2d 452, 454. Rational assertions of fact and reasonable inferences therefrom are deemed to be true, and any doubt as to a fact, or an inference to be drawn, is resolved in favor of the nonmoving party. *Malachowski, supra.* Even if the non-movant may be unsuccessful at trial, summary judgment is inappropriate where material facts conflict or undisputed facts lead to conflicting inferences. *Thomas v. Whiteford Nat. Lease* (1991), Ind. App., 580 N.E.2d 717, 718, *trans. denied.*

I.

*Independent Contractor Determination*

Detrick first contends that the trial court erroneously granted summary judgment in

favor of Midwest Pipe on the issue of whether Shaw was an independent contractor rather than an employee of Midwest Pipe.

■ A principal who controls or has the right to control the physical conduct of his agent in the performance of a service is a master, upon whom liability for the torts of the agent may be imposed. *Trinity Lutheran Church, Inc. v. Miller* (1983), Ind. App., 451 N.E.2d 1099, 1101–2. In contrast, the employer of an independent contractor is generally not liable for the torts of that contractor. *Hale v. Peabody Coal Company* (1976), 168 Ind.App. 336, 340, 343 N.E.2d 316, 320–21. As a general rule, an independent contractor controls the method and details of his task and is answerable to the principal as to results only. *Crabill v. Livengood* (1967), 142 Ind.App. 624, 231 N.E.2d 854.

■ Whether one employed to perform a task acts as an independent contractor or a servant is generally a question of fact. *Trinity, supra,* at 1104. However, where the relevant facts are undisputed, the court will determine whether the employer has the right to control the alleged employee by considering several factors: (1) right to discharge; (2) mode of payment; (3) supplying of tools by employer; (4) belief by the parties in the existence of a master-servant relationship; (5) control over the means used or result reached; (6) length of employment; and (7) establishing of work boundaries. *Stone v. Pinkerton Farms, Inc.* (7th Cir.1984), 741 F.2d 941, 943.

■ Voluminous depositions in support of the cross-motions on summary judgment were filed in the trial court, disclosing the following undisputed facts. Jerome Henry, the sole owner of Midwest Pipe, and Larry Davis, the sole incorporator of Midwest Trucking, entered into an oral agreement in 1988 whereby truck drivers recruited by Davis would ship Midwest Pipe steel via trucks and trailers owned or leased by Midwest Trucking.[1] Davis recruited Shaw, who had complied with Department of Transportation ("DOT") requirements for tractor-trailer drivers. No written lease or employment agreement was executed by any of the parties. Midwest Pipe paid Midwest Trucking $30.00 per hour; in turn, Midwest Trucking drivers were paid on an hourly basis. Drivers received no fringe benefits and were responsible for the payment of individual income taxes. Shaw, like other Midwest Trucking drivers, operated a truck which bore no Public Service Commission ("PSCI") or Interstate Commerce Commission ("ICC") permit number. The sole identification on the truck door panel consisted of the word "Midwest." Shortly after the May 1989 accident, Midwest Pipe ceased to ship steel via Midwest Trucking.

In short, the facts relevant to the mode of payment and length of employment are undisputed. However, the parties contest the facts relevant to all other indicia of employee control. Deponent Davis contended that Midwest Pipe possessed the authority to discharge Midwest Trucking drivers, supplied equipment and certain items of work apparel, and controlled the manner in which Midwest Trucking employee services were performed. Davis also claimed that Midwest Trucking employees used Midwest Pipe tools, operated Midwest Pipe equipment, were issued keys to the Midwest Pipe yard, assisted Midwest Pipe hourly employees in loading and unloading trailers, and performed routine maintenance tasks on Midwest Pipe "straight trucks" and fork lifts. He contended that Midwest Trucking hauled exclusively for Midwest Pipe and that "Midwest" was painted on the trucks to "jive with" the paperwork issued to drivers, whereby an impression was created (with Midwest Pipe's acquiescence) that the trucks were Midwest Pipe property. Davis stated that Midwest Pipe issued paperwork designating delivery by Midwest Trucking as delivery via "our truck." [Davis Deposition, pp. 14, 20, 24–5, 29, 31–2, 41, 65, 73, 78, 93, 122, 142, 148–9, 152] Furthermore,

---

1. The entity known as "Midwest Trucking, Inc." was incorporated after the verbal agreement between Davis and Henry was reached. Previously, Davis had done business as a partner in an unincorporated association known as "D & M Trucking."

Davis testified that Midwest Trucking drivers purchased and sold surplus steel for Midwest Pipe and "signed for" incoming loads as agents of Midwest Pipe. [Davis Deposition, p. 81–2, 151] On the other hand, Jerome Henry denied the existence of an agreement with Davis whereby Midwest Trucking would haul exclusively for Midwest Pipe while displaying the name Midwest. He disclaimed knowledge of any conduct by Midwest Trucking designed to create an appearance that Midwest Trucking drivers were "in-house" carriers allegedly exempt from ICC permit requirements. Henry also indicated that Midwest Trucking employees were not supervised by Midwest Pipe supervisors, were not subject to Midwest Pipe hiring/termination directives and did not routinely perform non-driving tasks for Midwest Pipe. Henry denied that Midwest Pipe designated Midwest Trucking employees as in-house shippers; he contended that the shipper designation of "O/T" appearing on Midwest Pipe invoices meant "our responsibility to ship" rather than "our truck." [Supplemental Record pp. 13, 30, 48, 66, 68, 75; Henry Deposition pp. 10, 15, 21, 34, 38, 48–50, 55] The depositions of Midwest Trucking drivers McBride, Hitzfield and Shaw and Midwest Pipe supervisor Firestine disclosed conflicts as to whether: the drivers were subject to supervision and termination by Midwest Pipe employees; the drivers were permitted access to Midwest Pipe equipment; the drivers operated Midwest Pipe vehicles; the drivers considered themselves Midwest Pipe drivers; or the drivers routinely performed non-driving tasks for Midwest Pipe. [Hitzfield Deposition pp. 8, 12, 15–16, 22–3, 25, 31, 37, 41; Shaw Deposition pp. 5, 28, 33, 34–5, 43, 55, 61, 88; McBride Deposition pp. 15, 23, 25; Firestine Deposition pp. 12, 20, 23, 30–31, 35]

The trial court entered extensive "Findings and Conclusions" in support of summary judgment on the issue of Shaw's status as an independent contractor or employee.[2] They included:

"[Midwest Pipe supervisor] Firestine could not hire or fire or discipline Midwest Trucking drivers in any way." [Record, p. 486];

"All significant tools and equipment for the drivers were supplied by Midwest Trucking." [Record, p. 488];

"The [Midwest Pipe] hats were simply a marketing tool to get the name of the company out into the market Midwest Pipe served and were not meant to identify the drivers as Midwest Pipe employees." [Record, pp. 489–90];

"Davis had ultimate control over his drivers and Robert Shaw in particular." [Record, p. 488].

The trial court, upon motion for summary judgment, may consider the pleadings, exhibits, depositions, affidavits and testimony, but may not resolve conflicting facts or assess credibility. *Skrypek v. St. Joseph Valley Bank* (1984), Ind.App., 469 N.E.2d 774. Here, the materials offered for the trial court's consideration disclose factual conflicts which must, for summary judgment purposes, be considered in a light favorable to the non-moving party.

The trial court improperly resolved disputed facts to conclude that Shaw was an independent contractor not subject to Midwest Pipe's control.

## II.

### *Estoppel*

Detrick next contends that the trial court erred in determining that Midwest Pipe was entitled to judgment as a matter of law on the estoppel claim. She argues that Midwest Pipe should be estopped from denying its status as Shaw's employer because Midwest Pipe knowingly permitted the impression to be conveyed to customers and to the public in general that Midwest Trucking drivers were Midwest Pipe employees.

---

**2.** Findings of fact are inappropriate when no issues of fact exist. However, a statement by the trial court as to its reasons for entering summary judgment may assist the reviewing court and afford the appellant an opportunity to address the merits of the trial court's rationale. *Celina Mut. Ins. Co. v. Forister* (1982), 438 N.E.2d 1007, 1012.

The elements of equitable estoppel are these: (1) a representation or concealment of material facts; (2) made by one having knowledge of the facts; (3) made to one without knowledge of the facts; (4) with the intention that the other party should act upon it; (5) inducing the other party to act upon the representation to his detriment. *Bogigian v. Bogigian* (1990), Ind.App., 551 N.E.2d 1149, 1151-2, *reh. denied*, 559 N.E.2d 1199. The foregoing elements are essentially those which would give rise to a claim for actual or constructive fraud. *Reeve v. Georgia–Pacific Corp.* (1987), Ind.App., 510 N.E.2d 1378, 1382.[3] However, the doctrine of equitable estoppel is not limited to circumstances involving an actual false representation or concealment of existing material fact. *Paramo v. Edwards* (1990), Ind., 563 N.E.2d 595, 598-9. "Whether particular conduct actually prevents inquiry, eludes investigation, or misleads, reflects upon the unconscionability of the resulting advantage." *Id.* at 599.[4]

Detrick relies upon *Kahf v. Charleston South Apartments* (1984), Ind. App., 461 N.E.2d 723, *reh. denied, trans. denied,* wherein the court stated: "In general, when one party allows another party to masquerade as the first party, liability may arise to unknowing third parties who do business with the permittee.... [A]n estoppel theory may apply to a case like this one.... It is well established that the representation of fact necessary to work an estoppel may be accomplished, not only by positive acts, but also by silence or acquiescence when good faith requires otherwise." *Id.* at 733-4.

A factual controversy exists as to whether Midwest Pipe invited or acquiesced in the creation of the impression that Midwest Trucking drivers were part of Midwest Pipe. Davis asserted that he specifically conferred with Henry concerning his lack of operating authority as a common carrier and the consequent necessity for operating as a "Midwest" carrier.[5] Moreover, Davis claimed that he and the other drivers were issued paperwork—prepared by Midwest Pipe supervisory employees—which was appropriate for "in-house" carriers (rather than common carriers), reflecting that shipping was "per our truck." He asserted that the lack of any common carrier operating authority was apparent because the truck door panels displayed no permit numbers as required of common carriers. [Davis Deposition pp. 13, 20–21, 142, 145] On the other hand, Henry claimed that Davis represented that he possessed appropriate operating authority. Henry indicated that he "didn't know about ICC license." [Henry Deposition pp. 10, 14, 15–6] Henry disclaimed knowledge of an exclusive hauling agreement or specific reasons for Davis' use of the name "Midwest." [Henry Deposition pp. 12, 34; Supplemental Record pp. 13, 21]

Detrick has identified disputed material facts which, if ultimately resolved in Detrick's favor, would support the operation of estoppel to prevent fraud consisting in the denial of that which was previously asserted.

### III.

#### *ICC Regulations*

Detrick next contends that the trial court erroneously granted summary judg-

---

3. An action is fraudulent if it tends to deceive, violate a public or private trust, or to injure public interests. *McDaniel v. Shepherd* (1991), Ind.App., 577 N.E.2d 239, 242.

4. Detrick concedes that Midwest Pipe made no direct representation to the decedent. Rather, she asserts that Midwest Pipe knowingly conveyed the impression to business associates and the public that the drivers were in-house carriers rather than common carriers. She contends that this representation enabled avoidance of DOT review of compliance with ICC requirements including maintenance of adequate liability insurance coverage. [It is undisputed that

the liability insurance coverage of the truck driven by Shaw was $100,000.00 rather than the requisite $750,000.00] She argues that the DOT—which acts for the protection of all members of the motoring public—was affirmatively misled by Midwest Pipe's unconscionable conduct and that Midwest Pipe should be estopped from profiting therefrom.

5. Davis stated: "I told him [Henry] I was incorporating and the only thing to my knowledge that we could do that was legal was to run under his name and paperwork and haul exclusively for him." [Davis Deposition, p. 21]

ment in favor of Midwest Pipe on Detrick's claim that Midwest Pipe is vicariously liable as a matter of law—pursuant to ICC regulations—for Shaw's negligence. The independent contractor—master/servant distinction has been eliminated for lease arrangements under ICC regulations. *Rediehs Exp., Inc. v. Maple* (1986), Ind.App., 491 N.E.2d 1006, 1011, *reh. denied, trans. denied, cert. denied* (1987), 480 U.S. 932, 107 S.Ct. 1571, 94 L.Ed.2d 762. Where the leased vehicle is involved in an accident during the term of the lease while carrying the ICC number of the common carrier with operating authority, the carrier is liable as a matter of law. *Id.*[6]

■ It is undisputed that Midwest Pipe possessed no ICC operating authority. Clearly, Shaw was not operating pursuant to a lease arrangement under ICC regulations. The trial court properly granted summary judgment in favor of Midwest Pipe on this claim.

### IV.

#### *"Alter Ego" Claim*

Detrick next argues that the trial court erroneously granted summary judgment in favor of Midwest Pipe on Detrick's claim that Midwest Trucking existed as the "alter ego or mere instrumentality" of Midwest Pipe.

■ To prevent fraud or injustice, the fiction of corporate entity may be disregarded where one corporation is so organized and controlled and its affairs are so conducted that it is a mere instrumentality or conduit of another corporation. *Stacey–*

*Rand, Inc. v. J.J. Holman, Inc.* (1988), Ind.App., 527 N.E.2d 726, 728, *reh. denied; Urbanational Developers, Inc. v. Shamrock Engineering, Inc.,* (1978), 175 Ind. App. 416, 431–32, 372 N.E.2d 742, 752, *reh. denied, trans. denied.* A careful review of the entire relationship between the corporate entities and their officers and directors is required to determine if justification exists for piercing the corporate veil. *Stacey, supra,* at 728. Justification may exist where innocent third parties have no way of knowing with which entity they are dealing. *Id.* at 729.

■ Here, the trial court found that no exceptional circumstances existed:

"It is undisputed that Midwest Pipe had no interest in Midwest Trucking, that there was no identity of shareholders, directors, or officers between the two companies, and that the corporations were formed at different times and for different purposes. Both continued to have separate and distinct purposes, separate officers and phone numbers and separate bank accounts and books. No funds of the corporations were ever intermingled.

The material facts are undisputed that exceptional circumstances do not exist to justify treating Midwest Trucking as the alter ego or mere instrumentality of Midwest Pipe; therefore, Midwest Pipe is entitled to summary judgment on this count as a matter of law."

Record, p. 491.

It is undisputed that Davis owns 100% of the stock of Midwest Trucking, Inc. and

---

6. The rationale underlying the imposition of vicarious liability was explained as follows: "Liability of a carrier is fixed as a matter of policy *upon the carrier owning operating authority* in lease situations in order to enforce ICC regulations.... [T]he lessee, by entering into the lease arrangement and placing his identification upon the vehicle, has vested the owner-lessor with authority he does not otherwise possess to transport commodities in interstate commerce. That authority continues during the duration of the lease and *until the identification is removed and possession is surrendered* ... When the carrier, by lease, permits an unregulated truck and driver to be on the road wearing its livery, it makes it possible for the owner of that unregulated equipment and the driver thereof to do what he otherwise could not do. The ICC regulation, therefore, makes the carrier responsible for the lessor's conduct, which includes financial ability, insurance coverage, safety of equipment, and competence of drivers.... In short, the policy enunciated in the ICC regulations and the cases make the carrier totally responsible to the injured plaintiff as a matter of law for the negligence of the lessor and its drivers of a leased vehicle. The carrier must, at his peril, exert care in his leasing arrangements and avoid leasing from 'gypsies' or fly-by-night, irresponsible truckers." *Id.* at 1011–12 (emphasis added).

that Henry owns 100% of the stock of Midwest Pipe, Inc. There are no common officers or directors; nor are funds commingled. However, exceptional circumstances may be established at trial by the resolution of the factual dispute which is central to Detrick's claims—whether Davis and Henry agreed that Midwest Trucking would be incorporated for the sole purpose of hauling Midwest Pipe product, would be identified as a "Midwest" carrier to the motoring public, and identified as a "Midwest Pipe" carrier to customers and DOT officials.

## V.

### Negligence Claim

Finally, Detrick asserts that the trial court erred in granting summary judgment to Midwest Pipe on the negligence claim. She argues that, if Midwest Trucking and Shaw are found to be independent contractors upon the resolution of disputed facts, Midwest Pipe may be found negligent for selecting incompetent contractors.

Although generally a principal is not liable for the torts of an independent contractor, a principal may be liable for the torts of a hired independent contractor if the consequences of the negligent failure to select a competent contractor cause the harm upon which a suit is based. *Stone, supra,* at 946. Detrick alleges that Midwest Pipe failed to ascertain that Midwest Trucking trucks were adequately insured or operated pursuant to appropriate intrastate or interstate operating authority.

Admittedly, Midwest Pipe failed to ascertain that each truck was subject to a certificate of insurance disclosing coverage of $750,000.00.[7] Moreover, Midwest Pipe failed to ascertain that Midwest Trucking, Inc. trucks were operating pursuant to valid permits. Supplemental Record, pp. 37, 59. Although a lack of due care may be conceded, the conduct must be the proximate cause of the harm upon which a claim

is based before liability may be imposed. *Id.*

The lack of permits and adequate liability insurance has no causal connection to Detrick's injury. *Id.* at 946–47. Therefore, the trial court properly granted summary judgment to Midwest Pipe on this claim.

Affirmed in part; reversed in part; and remanded for proceedings consistent with this opinion.

GARRARD and BUCHANAN, JJ., concur.

---

7. A certificate of insurance naming Midwest Trucking, Inc. as the insured and disclosing insurance coverage of $750,000.00 was located in Midwest Pipe files. However, the truck/trailer involved in the accident was not covered by the certificate of insurance. Supplemental Record, p. 90.