P.T. BARNUM'S NIGHTCLUB, Indy of Colorado d/b/a Mer II Corporation a/k/a PT's Show Club, Appellant–Defendant,

v.

Tijen DUHAMELL, Appellee–Plaintiff.

No. 49A02–0107–CV–481.

Court of Appeals of Indiana.

April 23, 2002.

Edward F. Harney, Jr., Debra G. Richards, Hume Smith Geddes Green & Simmons, LLP, Indianapolis, IN, Attorneys for Appellant.

Trevor J. Crossen, Wagner Reese & Crossen, LLP, Indianapolis, IN, Attorney for Appellee.

## OPINION

KIRSCH, Judge.

P.T. Barnum's Nightclub, Indy of Colorado d/b/a Mer II Corporation a/k/a PT's Show Club ("the Club") appeals the denial of its motion to strike and its motion for summary judgment in Tijen Duhamell's suit against it for injuries she sustained while a patron at the Club, raising the following issues for review:

I. Whether counsel representing a party to a lawsuit violates Rule of Professional Conduct 4.2 by engaging in ex parte conversations with a former employee of the adverse party when the adverse party is represented by counsel.

II. Whether the trial court erred in denying summary judgment on the grounds that a question of fact remains regarding whether the Club owed a duty to Duhamell on a theory of respondeat superior where Duhamell was injured during an interaction with a dancer performing at the Club.

We affirm.

## FACTS AND PROCEDURAL HISTORY [1]

The Club is an establishment which provides adult entertainment, more particularly exotic dancing, to its customers. Female entertainers perform daily; both female and male entertainers perform on Saturday nights. On Saturday, August 8, 1998, Duhamell attended a bachelorette party for her sister-in-law. After other activities, the party went to the Club to watch the male entertainers.

One of the male entertainers, Frank Ajishegiri, performed for the group that evening. At some point, Ajishegiri approached Duhamell and attempted to lift her. Duhamell urged him to leave her alone and to put her down to no avail. Ajishegiri and Duhamell fell, and Ajishegiri landed on Duhamell's hand, severely injuring her left fifth finger.

In December 1999, Duhamell brought suit against the Club for the injuries she sustained, lost wages, and medical bills. During the course of the litigation, Duhamell's counsel contacted Stewart Lobosco, a former Club employee and the general manager of the Club on the night of the accident. Duhamell's counsel inquired as to whether Lobosco was represented by the Club's counsel; Lobosco responded that he was not. Lobosco eventually signed an affidavit prepared by Duhamell's counsel.

Claiming that Duhamell's counsel's communications with Lobosco were improper, the Club moved to strike Lobosco's affidavit. In addition, the Club moved for summary judgment on the basis that Ajishegiri was an independent contractor and, therefore, the Club was not legally responsible for his actions under Duhamell's theory of respondeat superior.

The trial court denied both motions, and upon the Club's request, certified these orders for interlocutory appeal. This court accepted jurisdiction of the case.

## DISCUSSION AND DECISION

▇▇▇ The Club appeals the denial of its motion for summary judgment. When reviewing the grant or denial of a summary judgment motion, this court applies the same legal standard as the trial court, i.e., summary judgment is appropriate

---

1. We heard oral argument in this case on February 5, 2002 in West Lafayette, Indiana at Krannert Center on the campus of Purdue University. We thank our host, the Krannert Executive Education Program, and we commend counsel on the quality of their written and oral advocacy.

when no designated genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Indiana Ins. Co. v. Am. Cmty. Servs., Inc.,* 718 N.E.2d 1147, 1152 (Ind.Ct.App.1999); *May v. Frauhiger,* 716 N.E.2d 591, 594 (Ind.Ct.App.1999) (citing Ind. Trial Rule 56(C)); *Birrell v. Indiana Auto Sales & Repair,* 698 N.E.2d 6, 7 (Ind.Ct.App.1998), *trans. denied* (quoting *Stevenson v. Hamilton Mut. Ins. Co.,* 672 N.E.2d 467 (Ind. Ct.App.1996), *trans. denied* (1997)). · A party appealing the denial of summary judgment carries the burden of persuading this court that the trial court's decision was erroneous. *Indiana Ins. Co.,* 718 N.E.2d at 1152. The movant must demonstrate the absence of any genuine issue of fact as to a determinative issue and only then is the non-movant required to come forward with contrary evidence. *Id.* (citing *Jarboe v. Landmark Cmty. Newspapers,* 644 N.E.2d 118, 123 (Ind.1994)). This court may not search the entire record but may only consider the evidence that has been specifically designated. *Id.; Birrell,* 698 N.E.2d at 7 (quoting *Stevenson,* 672 N.E.2d at 467).

 All pleadings, affidavits, and testimony are construed liberally and in the light most favorable to the nonmoving party. *May,* 716 N.E.2d at 594. Even when facts are undisputed, summary judgment is not appropriate if those undisputed facts " 'give rise to conflicting inferences which would alter the outcome.' " *Id.* (quoting *Underwood v. City of Jasper Mun. Util.,* 678 N.E.2d 1280, 1282 (Ind.Ct.App.1997), *trans. denied*).

## I. Rule 4.2's Application to Former Employees

 The Club contends that Duhamell's counsel violated Rule of Professional Conduct 4.2 by contacting Lobosco, the Club's former employee and general manager.

Duhamell maintains that Rule 4.2 does not prohibit ex parte contact with former employees. Rule 4.2 provides:

"In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

### COMMENT

This Rule does not prohibit communication with a party, or an employee or agent of a party, concerning matters outside the representation. For example, the existence of a controversy between a government agency and a private party, or between two organizations, does not prohibit a lawyer for either from communicating with non-lawyer representatives of the other regarding a separate matter. Also, parties to a matter may communicate directly with each other and a lawyer having independent justification for communicating with the other party is permitted to do so. Communications authorized by law include, for example, the right of a party to a controversy with a government agency to speak with government officials about the matter.

In the case of an organization, this Rule prohibits communications by a lawyer for one party concerning the matter in representation *with persons having a managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization.* If an agent or employee of the organization is represented in the matter by his or her own counsel, the consent by that counsel to a

communication will be sufficient for purposes of this Rule. Compare Rule 3.4(f). This Rule also covers any person, whether or not a party to a formal proceeding, who is represented by counsel concerning the matter in question."

(Emphasis added.)

Courts in many jurisdictions that have interpreted this provision have looked to Formal Opinion 91–359 of the American Bar Association Standing Committee on Ethics and Professional Responsibility ("the Committee"). In that opinion, the Committee interpreted Rule 4.2 of the Model Code of Professional Responsibility, which was identical to Indiana's Rule 4.2, with regard to current and former employees of corporate parties. In doing so, it identified a dual rationale of the rule: to preserve the proper functioning of the legal system and to shield the adverse party from improper approaches. ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 359 (1991) (quoting *Wright v. Group Health Hosp.*, 103 Wash.2d 192, 691 P.2d 564, 567 (1984)). In addition, the rule rests on the notion that "the presumptively superior skills of the trained advocate should not be matched against those of one not trained in the law." *Id.* at 1001:102.

The Committee then examined the contours of the Rule and Comment as it related to present employees. Noting that the Comment delineates three specific categories of present employees covered by the Rule, the Committee concluded that communication with all other employees is permissible without consent. The Committee then stated that neither the Rule nor the Comment deals with former employees of a corporate party, but remarked that "the concerns reflected in the Comment to Rule 4.2 may survive the termination of the employment relationship." *Id.* at 1001:103. The Committee discussed various approaches taken by courts and commentators considering the issue and agreed that "persuasive policy arguments can be and have been made" for including former employees within the reach of Rule 4.2. *Id.* It nonetheless rejected such a position, relying instead on the text of the Rule and the lack of any indication in the Comment that such coverage was intended. *Id.* at 1001:104. Accordingly, it concluded that a lawyer may have ex parte contact with a corporate party's former employees.[2] The Committee cautioned, however, that such contact must not violate other Rules of Professional Conduct, including Rule 4.4, which prohibits the lawyer from inducing the former employee to violate the attorney client privilege, and Rule 4.3, which requires the lawyer to make clear his or her role in the matter and the identity and respective positions of the parties involved. *Id.* at 1001:104–105.

Courts that have followed this reasoning have held that contacts with former employees are not barred by Rule 4.2. For example, in *Humco, Inc. v. Noble,* 31 S.W.3d 916 (Ky.2000), the Kentucky Supreme Court interpreted Kentucky's Rule 4.2, which is identical to Indiana's Rule 4.2

---

2. In reaching a similar conclusion, the court in *Amity Reg. School Dist. No. 5 v. Atlas Const. Co.*, No. X06CV9901533885, 2001 WL 219724, at *8 (Conn.Super. Feb. 9, 2001), quoted Professor Hazard about the scope of Rule 4.2:

"This regime does not address communications with former agents and employees, and technically there should be no bar, since former employees cannot bind the organization, and their statements cannot be introduced as admissions of the organization. Speaking with the former employee therefore does not do damage to the policy underlying Rule 4.2—undercutting or end-running an ongoing lawyer-client relationship."

(quoting G. HAZARD & HODES, THE LAW OF LAWYERING: A HANDBOOK ON THE MODEL RULES OF PROFESSIONAL CONDUCT, 486 (1988 Supp.)).

and the Model Rule discussed in Formal Opinion 91–359. The court relied extensively on the Formal Opinion and concluded that it represented the sound approach and the majority rule in other jurisdictions. The court observed that this approach is consistent with the purposes and policies of the Rule. It opined that Rule 4.2 was not meant to prevent the flow of information, even if damaging, but to preserve the positions of the parties in the adversarial system and to maintain the protections obtained by employing counsel. It explained that a former employee of a corporate party with no present relationship with it is not a "party" under the rule and the person "is not adverse in the sense that his interests are at stake in the litigation." *Id.* at 920.

Similarly, the Florida Supreme Court also concluded that Florida's version of Rule 4.2 does not apply to former employees of corporate parties in *H.B.A. Mgmt., Inc. v. Estate of Schwartz,* 693 So.2d 541 (Fla.1997). The *H.B.A.* court also relied heavily on the Formal Opinion and examined the amendment of the comment in 1995, which added the final sentence, effectively expanding the scope of the Rule to include any person represented by counsel regarding the matter in question. The court noted that this amendment clarified that current employees are covered by the Rule even though they may not be formal parties to the suit. The court further observed that in spite of this expansion of the Rule's coverage, former employees are still not mentioned by the Rule or Comment. It concluded that Rule 4.2 was intended to regulate an attorney's contact with people represented by counsel, and the Rule "neither contemplates nor prohibits an attorney's ex parte communications with former employees of a defendant-employer." *Id.* at 546. The court commented that this result is just because such former employees can-

not speak for or bind the organization. *Id.* at 544.

In *Continental Ins. Co. v. Superior Ct.,* 32 Cal.App.4th 94, 37 Cal.Rptr.2d 843 (1995), the court explained that its decision not to extend Rule 4.2 to former employees was consistent with the policy objectives of the rule:

"Several problems inhere in an approach that prohibits ex parte communication with former employees of a corporate adversary. First, such communication with a former employee does not effect an end-run around the protections afforded by the corporate attorney-client relationship. Clearly, ex parte communication with former employees cannot improperly influence settlement because such employees have no influence over the corporation's litigation strategy or over decisions to settle. Similarly, since the former employee is not involved in the corporation's attorney-client relationship, ex parte communication cannot undermine that relationship. Additionally, because the former employee no longer is an agent of the corporation, she cannot make revelations that bind the corporation as evidentiary admissions so that the concern about improvident statements is not implicated. Second, prohibiting ex parte contacts with former employees, like a blanket prohibition on such contact with present employees, unduly impedes the flow of information and unnecessarily increases the costs of litigation."

*Id.* at 858–59 (quoting Stephen M. Sinaiko, *Ex Parte Communication and the Corporate Adversary: A New Approach,* 66 N.Y.U.L. Rev. 1456, 1492–93 (1991)).

Many other courts have also followed this text-based approach. *See, e.g., Houck v. Hardee's Food Sys., Inc.,* No. 5:98–CV–373–BR(2), 1999 WL 1939988 (E.D.N.C. May 23, 1999); *Westside–Marrero Jeep*

*Eagle, Inc. v. Chrysler Corp.*, No. CIV A97–3012, 1998 WL 186705 (E.D.La. Apr. 17, 1998) (contact even with long term, former managerial employee not prohibited so long as no privileged information is gathered); *Sharpe v. Leonard Stulman Enter. Ltd. P'ship*, 12 F.Supp.2d 502 (D.Md.1998); *Brown v. St. Joseph County*, 148 F.R.D. 246 (N.D.Ind.1993); *Carrier Corp. v. The Home Ins. Co.*, No. CV88–352383S, 1992 WL 32568 (Conn.Super. Feb.11, 1992); *DiOssi v. Edison*, 583 A.2d 1343 (Del.Super.1990); *Schmidt v. Gregorio*, 705 So.2d 742 (La.Ct.App.1993); *Pritts v. Wendy's of Greater Pittsburgh, Inc.*, No. GD97–3173, 1998 WL 1004930 (Pa. Commw.Ct. Jun. 23, 1998). *See also State ex rel. Charleston Area Med. Ctr. v. Zakaib*, 190 W.Va. 186, 437 S.E.2d 759, 763 (1993) ("[A] majority of jurisdictions that have had occasion to consider whether Rule 4.2 restrictions are applicable to former employees have concluded that they are not."); *Strawser v. Exxon Co., U.S.A.*, 843 P.2d 613, 622 (Wyo.1992) ("[T]he overwhelming recent trend has been for courts to find that Rule 4.2 does not generally bar ex parte contacts with former employees.") (listing federal and state cases).

Also following the lead of the Committee, other courts have held that Rule 4.2 does not apply to former employees, yet stressed that attorneys contacting former employees must vigilantly observe the other professional rules. *See, e.g., Thorn v. Sunstrand Corp.*, No. 95C50099, 1997 WL 627607 (N.D.Ill. Oct. 10, 1997) (although Rule 4.2 permits ex parte contact with former employees, former employees are not permitted to discuss privileged information to which they are privy); *Jenkins v. Wal–Mart Stores, Inc.*, 956 F.Supp. 695 (W.D.La.1997) (concerns behind Rule 4.2 are largely absent with regard to former employees, so Rule does not apply, but contacting attorney may not address areas subject to the attorney-client privilege).

Apparently mindful of the potentially damaging information that may be gathered by contacting former employees of a corporate party, some courts, while declining to impose a per se ban, have imposed certain limitations on the types of employees that may be contacted. For example, in *Lang v. Superior Court*, 170 Ariz. 602, 826 P.2d 1228 (Ct.App.1992), the court identified four purposes underlying Rule 4.2: 1) to prevent unprincipled attorneys from exploiting the disparity in legal skills between attorneys and lay people; 2) to preserve the integrity of the attorney-client relationship; 3) to help prevent the inadvertent disclosure of privileged information; and 4) to facilitate settlement. *Id.* at 1230. The court then noted that the Comment identifies three groups of individuals: those with managerial responsibility; those whose act or omission may be imputed to the organization; and any person whose statement may constitute an admission on the part of the organization. *Id.* at 1230–31. The court reasoned that the first and third categories contemplate some current connection to the organization, but that the second category did not. After examining authorities from various jurisdictions, the court concluded that the Rule permitted ex parte contacts with former employees. It noted that neither the Rule nor the Comment specifically mention former employees and that the Rule also does not ban all ex parte contacts, but only contacts with those listed in the Comment. Further, it determined that "neither the threat of disclosure of confidential information nor the desire to protect the organization from liability-creating statements justifies a blanket ban on ex parte communications." *Id.* at 1233. It concluded, however, that Rule 4.2 does not permit such contacts if the acts or omissions of the former employee gave rise to the underlying litigation or the former employee

has an ongoing relationship with the former employer in connection with the litigation. *Id.*

Similarly, in *Clark v. Beverly Health & Rehab. Servs., Inc.,* No. 990163B, 2001 WL 914195 (Mass.Super. Jul. 5, 2001), the corporate defendant sought a protective order from plaintiff's counsel contacting former employees. The court found that Rule 4.2 "does not adequately define" what conduct is prohibited. *Id.* The court therefore looked to the Comment and the classification of persons to whom the rule applies. Based on this language, the court found good cause to issue the protective order because plaintiff's counsel was attempting to contact former employees "who were directly involved in the subject matter of the litigation." Accordingly, the employees' statements could constitute admissions and their acts could be imputed to the defendant. *See also Notopoulos v. Hartford Hosp.,* No. CV940544706, 1996 WL 151842 (Conn.Super. Mar. 12, 1996) (plaintiff's counsel may not contact former employees whose acts or omission may be imputed to defendant and who are protected by the attorney-client privilege generally, but may inquire as to impeachment evidence such as bias). *But see Pardo v. General Hosp. Corp.,* No. 982714, 2000 WL 33170689 (Mass.Super. Oct. 31, 2000) (noting that federal and state courts in Massachusetts have interpreted Rule 4.2 broadly to prohibit indiscriminate contact with present and former employees of corporate parties). *See also Klier v. Sordoni Skanska Constr. Co.,* 337 N.J.Super. 76, 766 A.2d 761 (App.Div.2001) (interpreting analog to Rule 4.2 which includes language about "litigation control group").

Another court made a different distinction in *NAACP v. State of Florida,* 122 F.Supp.2d 1335 (M.D.Fla.2000), where the court applied Florida's Rule 4.2 to ex parte contacts with former employees.

The court noted Formal Opinion 91–359 and an opinion by the Florida Bar. The court also commented that the issue had been addressed by many courts with conflicting results. The court observed that Rule 4.2 was not intended to control or limit discovery and concluded that it did not bar contacts with former "rank and file" employees. However, it noted the "viable concern" that some former employees could make statements that would constitute admissions under Federal Rule of Evidence 801(d)(2)(d). Accordingly, the court then fashioned a number of guidelines, the import of which was to enforce the Rules of Professional Responsibility to all contacts and to bar contact with former employees who "may have been members of management or 'high-level' employees who had access to privileged or confidential communications/information, participated in decision-making activities, and/or worked with the attorneys representing the [defendant]." *Id.* at 1340 n. 6.

Finally, in *Olson v. Snap Prod., Inc.,* 183 F.R.D. 539 (D.Minn.1998), the court evaluated a party's motion to disqualify opposing counsel based on counsel's ex parte contacts with former employees. The court noted that the majority rule on this issue was to find no bar to ex parte contacts. However, it stated that other courts are "concerned with the unfairness of litigants being able to obtain the sensitive information of an opponent from the opponent's past employees[.]" *Id.* at 544. Accordingly, the court declined to adopt a bright-line rule. Instead, it held that the pivotal question in such cases is whether the contact is likely to undermine the attorney-client privilege. Finding no such violation in this case, the court refused to disqualify counsel. *Id.* at 545. *See also FleetBoston Robertson Stephens, Inc. v. Innovex, Inc.,* 172 F.Supp.2d 1190, 1195 (D.Minn.2001) (quoting from *Olson* with approval and adopting this approach); *Michaels v. Woodland,* 988

F.Supp. 468, 471 (D.N.J.1997) ("Nothing in the Rules prohibits ex parte communications with a former employee who was not within the litigation control group and who is not otherwise represented by counsel.").

■ We join with the majority of jurisdictions that have analyzed this issue and hold that Indiana's Rule 4.2 does not prohibit an attorney from contacting the former employee of a party adverse to the attorney's client in litigation. In reaching this decision, we are guided primarily by the text of the Rule, which refers only to communication with "a party." Former employees such as Lobosco are clearly not "parties" to the litigation. The Comment then clarifies who qualifies as a "party" in the case of a corporate party. Like the Committee, we find it persuasive that the Comment delineates certain classes of employees to which the Rule applies. No language in the Comment suggests that the Rule should even be applied to all current employees—much less former employees.

In so holding, we recognize the danger that allowing such contacts creates and are mindful of the limitations some courts have imposed to address these dangers. We are particularly troubled by the possibility that ex parte interviews could lead to the disclosure of information protected by the attorney-client privilege. While Rule 4.4 prohibits an attorney from inducing anyone to violate an attorney-client privilege, it does not reach the situation where the disclosure of such privileged communication was inadvertent and unsolicited. However, we find no language in Rule 4.2 suggesting any limitations on contact with former employees. Recognizing the drawbacks of Rule 4.2 as applied in this situation, our supreme court with its rule-making authority may wish to revisit this issue. Until then, we hold that Rule 4.2 contains no limitations on the contacts an attorney

may make with the former employee of an adverse party. Accordingly, the trial court did not err in denying the Club's motion to strike the Lobosco affidavit.

## II. Employee or Independent Contractor

■ The Club next maintains that the trial court erred in denying its motion for summary judgment. It contends that there is no genuine issue of material fact with regard to its duty to Duhamell (or rather, lack thereof) because Ajishegiri was an independent contractor, not an employee of the Club.

■ To sustain an action for negligence a party must show: 1) the other party's duty to conform its conduct to a standard of care arising from its relationship with him; 2) a breach of that duty; and 3) an injury proximately caused by the breach of that duty. *Zawacki v. U.S.X.*, 750 N.E.2d 410, 414 (Ind.Ct.App.2001). Whether a party breached a duty and whether the breach proximately caused injury are generally questions for the trier of fact. *Id.* However, the existence of a duty is a question of law for the court. *Id.; Kahrs v. Conley*, 729 N.E.2d 191, 194 (Ind.Ct.App.2000), *trans. denied.*

■ In Indiana, the general rule is that a principal is not liable for the negligence of an independent contractor. *Becker v. Kreilein*, 754 N.E.2d 939, 946 (Ind.Ct. App.2001); *Hale v. R.R. Donnelley and Sons*, 729 N.E.2d 1025, 1027 (Ind.Ct.App. 2000), *trans. denied* (2001). In contrast to an employee, " 'an independent contractor controls the method and details of his task and is answerable to the principal as to results only.' " *Mortgage Consultants, Inc. v. Mahaney*, 655 N.E.2d 493, 495–96 (Ind.1995) (quoting *Detrick v. Midwest Pipe & Steel, Inc.*, 598 N.E.2d 1074, 1077 (Ind.Ct.App.1992)). Typically, whether one acts as an employee or an independent

contractor is a question of fact. *Mortgage Consultants*, 655 N.E.2d at 495–96; *Indiana Ins. Co.*, 718 N.E.2d at 1153.

 In *Mortgage Consultants*, 655 N.E.2d at 495–96, our supreme court referred to the Restatement (Second) of Agency § 220 (1958) to determine whether an individual is an employee or an independent contractor. *See id.* at 499 n. 2. Section 220 states:

"(1) A servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control.

(2) In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered:

(a) the extent of control which, by the agreement, the master may exercise over the details of the work;

(b) whether or not the one employed is engaged in a distinct occupation or business;

(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

(d) the skill required in the particular occupation;

(e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

(f) the length of time for which the person is employed;

(g) the method of payment, whether by the time or by the job;

(h) whether or not the work is a part of the regular business of the employer;

(i) whether or not the parties believe they are creating the relation of master and servant; and

(j) whether the principal is or is not in business."

Our supreme court has identified the most important of those as: (1) right to discharge; (2) mode of payment; (3) supplying tools or equipment; (4) belief of the parties in the existence of an employer-employee relationship; (5) control over the means used in the results reached; (6) length of employment; and (7) establishment of the work boundaries. *GKN Co. v. Magness*, 744 N.E.2d 397, 402 (Ind.2001). The factors must be weighed against each other as a part of a balancing test as opposed to a mathematical formula where the majority wins. *Id.* Furthermore, no factor is dispositive. *Mortgage Consultants*, 655 N.E.2d at 495–96. When applying this balancing test, the trial court should give the greatest weight to the right of the employer to exercise control over the manner and means by which the work is to be accomplished. *GKN Co.*, 744 N.E.2d at 403. Moreover, this list of factors is not exhaustive. *Mortgage Consultants*, 655 N.E.2d at 495–96. An employer-employee relationship may be found despite the parties' designation of independent contractor status, if enough of the indicia of an employer-employee relationship exist. *Id.*

Here, the parties disagree as to the amount of control over the male entertainers the Club exercised, as well as the application of the other nine Section 220 factors. The principal materials offered to support the parties' respective positions are Ajishegiri's deposition testimony and Lobosco's affidavit.

### A. Extent of master's control

Section 220 looks to the extent of the master's control as indicative of whether a servant is more properly characterized as an employee or an independent contractor.

In this case, Lobosco stated that, as general manager, he assisted in scheduling male dancers at the Club on a regular basis. He scheduled the head dancer to have several other male dancers perform on a weekly basis. He stated that he held regular meetings in the Club dressing room with the male dancers before their shift began to discuss the Club's policies, including the conduct of dancers with patrons. Lobosco explained that the Club provided guidelines for the dancers, such as shift start time and ending time, which remained the same throughout his employment. He also required the dancers to be on stage for a three song set, as well as for announcements. He explained that male dancers could be disciplined for failing to follow these guidelines. He acknowledged that the Club had the right to direct and control the dancers' work environment, including the stage on which they appeared.

Ajishegiri testified that the head dancer scheduled the male dancers and decided who would perform. Ajishegiri stated that he could take the night off with only the head dancer's approval. He explained that he was now in charge of the male dancers at the Club but was not at the time of the incident. Ajishegiri testified that the Club expected the male dancers to observe the same rules of professionalism that applied to the female dancers. Ajishegiri reported to the manager when he came to work. The Club required him to be on the premises at a specified time prior to the start of his shift, and his shift normally lasted the same length of time each week. He did not share his tips with the Club, but he did share his tips with the disc jockeys and bartenders at his discretion.

He explained that, as head dancer, he has given verbal warnings to other male dancers regarding their conduct. He could get verbal warnings from the manager for inappropriate interaction with customers and could be terminated for conduct exhibiting a lack of professionalism.

### B. Occupational factors

Section 220 refers to the nature of the business as a distinct occupation or business, the custom of the locality with regard to direction or supervision of the work, and the skill required to perform the work. There is little summary judgment evidence on these factors, although dancers were required to audition before being hired.

### C. Situational factors

Section 220 also requires courts to look to which party supplied the tools and the place of work, the length of time for which the person is employed, and the parties' method of payment.

Here, the Club supplied the building, music, disc jockey, beverages, stages, and dressing rooms for Ajishegiri and the other male dancers. Ajishegiri supplied his own costumes and props. Ajishegiri danced at the Club weekly for over a year prior to the incident and for more than a year after that time. The Club paid him a nightly rate for dancing, typically fifty dollars per night.

### D. Regular business of the master and servant

The regular business of both parties is also relevant to the employee/independent contractor determination. *See* Restatement (Second) of Agency § 220 (1958). The Club provides female dancers daily and male dancers weekly. Ajishegiri testified that the Club provided male dancers every Saturday and that he worked most Saturdays for over a year prior to the incident. He did not dance at other clubs, but was also employed during the week as a stockbroker.

### E. Intent of the parties

Finally, courts look to the intent or belief of the parties regarding their relationship. *See id.* Lobosco believed that the

male dancers were employees of the Club, although the Club never withheld taxes or provided benefits. By contrast, Ajishegiri testified that he believed himself to be an independent contractor for the Club under a verbal agreement.

Here, the Club exercised some degree of control over Ajishegiri's work, particularly with regard to work hours, conditions, and regulations, and was in the business of displaying adult entertainers (primarily female), but did not dictate the stylistic aspects of Ajishegiri's performance. We believe that these facts give rise to conflicting inferences that create a genuine issue of material fact regarding whether Ajishegiri was an employee or an independent contractor. The trial court did not err in denying the Club's motion for summary judgment.

Affirmed.[3]

SULLIVAN, J., concurs with separate opinion.

ROBB, J., concurs with separate opinion.

SULLIVAN, Judge, concurring.

I fully concur with respect to Part II. I also concur as to Part I but in doing so would merely add an observation concerning the possible evaluation of Rule 4.2 by our Supreme Court.

I am in total agreement with the majority opinion in that it holds that any result other than that reached would in effect rewrite the Rule itself. I nevertheless share the majority's concern about certain possibilities which would involve disclosure of information protected by an attorney-client privilege. For example, I am trou-

bled by seeming to place an imprimatur upon an ex parte interview with a former employee which obtains privileged information communicated to the defendant's counsel upon a different but related or analogous matter while the interviewee was an employee. Such information may or may not be relevant to the litigation in question but it may nevertheless be the appropriate subject of protection.

Again, however, this is a call best left to our Supreme Court. If and when such consideration is given, the Court may well wish to consider some policy advantages to something other than the all-or-nothing implication of the Rule as written. For instance, rather than requiring a court order to conduct any ex parte conversation with a former employee, the litigant's attorney might be permitted to contact and speak informally with the former employee to learn whether it would be worthwhile to proceed further. Any such informal ex parte statement, however, would not be subject to use for any purpose except as a launching pad for the formal process of taking the former employee's deposition at which the attorney-client privilege and other matters of concern to the employer might be protected. *See Curley v. Cumberland Farms, Inc.,* 134 F.R.D. 77, 93–95 (D.N.J.1991).

Be that as it may, I fully concur in the majority opinion.

ROBB, Judge, concurring with separate opinion.

I concur with the majority opinion, but write separately to address an issue raised by this case that concerns me: the use of

---

**3.** The Club also argues that the trial court erred in failing to strike paragraph 11 of Lobosco's affidavit, in which he asserts his belief that the male dancers were the Club's employees. We need not reach this issue be-

cause even if we were to hold that the paragraph should have been stricken, we would still affirm the trial court's decision to deny the Club's motion for summary judgment.

the Rules of Professional Conduct as the substantive basis for a cause of action.

Our Rules of Professional Conduct are prefaced by a preamble which states, in part:

> Violation of a Rule should not give rise to a cause of action nor should it create any presumption that a legal duty has been breached. The Rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability, but reference to these rules as evidence of the applicable standard of care is not prohibited. Furthermore, the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons. The fact that a rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the Rule.

Ind. Rules of Professional Conduct, Preamble, Scope. The Rules of Professional Conduct lack the force and effect of statutes or case law. *Trotter v. Nelson,* 684 N.E.2d 1150, 1156 n. 4 (Ind.1997); *Kizer v. Davis,* 174 Ind.App. 559, 369 N.E.2d 439, 443 (1977) (noting the same with respect to the Code of Professional Responsibility, which governed the conduct of attorneys until 1987, when the Model Rules were adopted and replaced the Code). Our supreme court has noted that "[t]he preambles to the Rules of Professional Conduct ... make it clear that their provisions do not purport to create or describe any civil liability...." *Sanders v. Townsend,* 582 N.E.2d 355, 359 (Ind.1991). Rather, they operate "as the rule of law in disciplinary proceedings before the Supreme Court. [They] delineate[ ] the conduct that will

render an attorney subject to censure." *Kizer,* 369 N.E.2d at 443.

Recently, however, our supreme court decided the case of *Allstate Ins. Co. v. Watson,* 747 N.E.2d 545 (Ind.2001). In that case, the court addressed the issue of the trial court's denial of a motion for relief from default judgment. The court held that "a default judgment must be set aside under Indiana Trial Rule 60(B)(3) where, during negotiations, the plaintiff's attorney disregarded a prior assurance to the defendant and · obtained a default judgment." *Id.* at 546. In so holding, the court referenced a violation of the Rules of Professional Conduct as a means of showing a misrepresentation or misconduct for Trial Rule 60(B) purposes. *See id.* at 548. *See also Smith v. Johnston,* 711 N.E.2d 1259 (Ind.1999) (setting aside a default judgment obtained by the plaintiff's attorney without notifying counsel known to be representing the adverse party because, although the conduct was in technical compliance with the Trial Rules, it was obtained in violation of Rule of Professional Conduct 8.4(d) which states that it is professional misconduct for a lawyer "to engage in conduct that is prejudicial to the administration of justice.").

It seems to me that *Watson* and *Smith* have the potential to start us on the fabled slippery slope by encouraging, or at least not foreclosing, the pleading of a violation of the Rules as a substantive claim for liability when the clear mandate of the Rules is otherwise. Can these cases be interpreted to mean that when an attorney is disciplined it makes the underlying lawsuit suspect? It seems to me that this could be where we are heading, and I believe the Rules clearly state that is not their purpose. In neither *Watson* nor *Smith* was a violation of the Rules substantively pled as a basis for attorney lia-

bility; rather, it was pled as a defense to a procedural default. Here, too, the Club has pled a supposed violation of the Rules as a means of defending a summary judgment rather than substantively pleading attorney misconduct under the Rules as a basis for liability. Nonetheless, I am troubled by the implications of referring to the Rules in such a way either at the trial or appellate level.

Notwithstanding my concern over the erosion of the limited scope and purpose of the Rules of Professional Conduct, I believe the communication between Duhamell's counsel and Lobosco was appropriate and therefore Lobosco's affidavit was properly gathered and the trial court properly denied the Club's motion to strike. I therefore concur in Part I of the majority decision with the caveat that it should not be construed in the future to sanction allowing a substantive claim under the Rules of Professional Conduct in anything other than a disciplinary proceeding. In all other respects, I concur with the majority opinion.