REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2059

September Term, 2013

ASPHALT & CONCRETE SERVICES, INC.

v.

MORAN BURDETTE PERRY

Eyler, Deborah S.,
Graeff,
Reed,

JJ.

Opinion by Graeff, J.

Filed: October 30, 2014

Moran Perry, appellee, filed a complaint in the Circuit Court for Prince George's County, seeking compensatory damages for injuries he sustained when he was struck by a dump truck while crossing an intersection. He sued Higher Power Trucking, LLC ("Higher Power"), William H. Johnson, II, and appellant, Asphalt & Concrete Services, Inc. ("ACS"), alleging negligence and negligent hiring and supervision.[1] A jury found that Mr. Johnson's negligence in operating his vehicle was the proximate cause of Mr. Perry's injuries, that Mr. Johnson was an employee of ACS, and that ACS was negligent in hiring Mr. Johnson. It awarded Mr. Perry $529,500 in damages.

On appeal, ACS presents four questions for our review, which we have rephrased slightly, as follows:

1. Did the circuit court err in admitting evidence of Mr. Johnson's suspended driver's license, expired vehicle registration, negative driving record, and lack of liability insurance?

2. Did the circuit court err in denying ACS's motion to dismiss Mr. Perry's initial complaint?

3. Did the circuit court abuse its discretion in permitting Mr. Perry to amend his initial complaint after the statute of limitations had expired?

4. Did the court err in denying ACS's motions for judgment?

For the reasons set forth below, we answer the last three questions in the negative, but we agree with ACS that the circuit court erred in admitting evidence of Mr. Johnson's lack

---

[1] Neither Higher Power nor Mr. Johnson filed an answer or participated in the litigation.

of insurance. Accordingly, we shall reverse the judgment of the circuit court and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

On April 11, 2012, Mr. Perry filed his initial complaint. He alleged that, on April 28, 2009, while he was walking in an intersection with the right of way, Mr. Johnson hit him with the dump truck he was driving, causing Mr. Perry "profound and painful injuries." Mr. Perry alleged that Mr. Johnson was employed by Higher Power, that ACS had hired Higher Power as its agent and/or servant, and that Higher Power was subject to ACS's direction and control.

Count I alleged negligence, asserting that ACS, Higher Power, and Mr. Johnson owed duties of care to Mr. Perry "to lawfully operate the truck in a safe and reasonable manner," and they breached those duties by negligently operating the vehicle and by operating the vehicle "in violation of Maryland law regarding licensure and insurance." Count II alleged that ACS had negligently hired and supervised Higher Power, and it breached its duties to ensure that Higher Power "utilized properly licensed drivers without reckless propensities and that the vehicles utilized by Higher Power for the benefit of ACS were properly insured as required by law."

On August 30, 2013, after the completion of discovery, ACS filed a Motion for Summary Judgment, asserting that there was no dispute that Mr. Johnson was not an employee of ACS, as he was employed by Higher Power, and therefore, ACS could not be

vicariously liable for Mr. Johnson's actions under the doctrine of *respondeat superior*. It further asserted that, even if ACS and Mr. Johnson did have an employment relationship, and ACS had a duty to ensure that Higher Power used properly licensed and insured drivers, any breach of that duty was not the proximate cause of the accident.

On September 27, 2013, Mr. Perry filed a Motion for Leave to File a First Amended Complaint to "conform the allegations contained in the original Complaint with undisputed evidence[] developed through discovery." Specifically, Mr. Perry stated that the evidence developed during discovery established that Higher Power "was a forfeited limited liability company and was not in good standing according to the publicly available records of the Maryland State Department of Assessments and Taxation [("SDAT")] at the time of the accident." Accordingly, Mr. Perry asserted, Higher Power was not authorized to do business in Maryland, and Mr. Johnson was unlawfully utilizing the name to operate his dump truck business. Mr. Perry, therefore, sought to dismiss Higher Power as a separate named defendant and amend the complaint to reflect that Higher Power "was simply a trade name under which [Mr. Johnson] was unlawfully operating his dump truck business."

The proposed first amended complaint alleged that ACS employed Mr. Johnson as its agent and/or servant and that Mr. Johnson was subject to ACS's control and direction. It alleged the same counts, negligence and negligent hiring and supervision, but it substituted Mr. Johnson for Higher Power as ACS's agent, servant and/or employee, acting at the direction and control of ACS.

On October 2, 2013, ACS filed a motion to dismiss Mr. Perry's initial complaint and a response in opposition to the Motion for Leave to File an Amended Complaint. With respect to the initial complaint, ACS asserted that it failed to state a claim upon which relief could be granted. It asserted that Mr. Johnson was an employee of Higher Power, not ACS, and therefore, it could not be liable for Mr. Johnson's negligent actions under the theory of *respondeat superior*, and it had no duty to ensure that Higher Power's employees were properly licensed and insured. With respect to Mr. Perry's motion for leave to amend, ACS argued that the motion should be denied, asserting that the proposed amended complaint introduced "new material facts and new causes of actions against [ACS]," and, because the statute of limitations on new causes of action arising out of the incident had expired on April 30, 2012, the amended complaint was time-barred.

On October 4, 2013, the court held a hearing on ACS's motion for summary judgment, ACS's motion to dismiss, and Mr. Perry's motion for leave to amend. ACS argued that there was no allegation in the original complaint that Mr. Johnson was ACS's employee, and therefore, the complaint failed to state a claim on which relief could be granted. Mr. Perry responded that, although the initial complaint indicated his intent to hold ACS responsible for the actions of Higher Power, he learned during discovery that Higher Power was not a legal entity, but instead, it was a trade name under which Mr. Johnson operated. He further argued that there was ample evidence from which a jury could conclude that Mr. Johnson was ACS's employee and that ACS had actual or constructive knowledge of

Mr. Johnson's incompetence. In support of the latter contention, Mr. Perry argued that ACS was aware that Mr. Johnson did not have a valid license or insurance, and he was operating an unregistered vehicle.

The court denied ACS's motions. It granted Mr. Perry's motion, stating that "he just wants to conform the complaint to reflect that Higher Power Trucking, LLC was simply a trade name."

On October 7, 2013, trial began. At the start of trial, ACS requested that the court grant a thirty-day postponement so it could file an answer to Mr. Perry's first amended complaint and a third-party claim against Higher Power. Mr. Perry argued that the operative facts had not changed because the complaint ultimately alleged that ACS was responsible for Mr. Johnson's conduct. Summarizing Mr. Perry's response as an argument that "there's no difference between Higher Power and [Mr.] Johnson," the court denied the motion.

ACS then filed a motion to dismiss the first amended complaint on the ground that it was filed beyond the three-year limitations period. It argued that the original complaint against Higher Power, as an agent of ACS, was a nullity because a complaint filed against a forfeited corporation is a nullity, which does not toll the statute of limitations. Counsel for Mr. Perry argued that the original complaint identified both Higher Power and Mr. Johnson as defendants, and that the only fact that had changed was the discovery that Higher Power was "nothing more than a trade name." The court denied ACS's motion.

The court next heard arguments on ACS's motions in limine, which sought to preclude evidence that, at the time of the accident, Mr. Johnson had a suspended driver's license and the vehicle was uninsured. Counsel for ACS proffered that Mr. Johnson's license was suspended, not for a moving violation, but for failing to appear in court. He argued that "whether or not Mr. Johnson's license was suspended does not speak to his ability to operate a motor vehicle safely," and there was no evidence that ACS knew his license was suspended. Counsel began to argue its motion with respect to the lack of insurance, but the court stated that it would reserve on its ruling until it had "more of a factual basis."

During opening statements, counsel set forth their opposing theories for the jury. Counsel for Mr. Perry stated that the evidence would show that Mr. Johnson was acting as an employee of ACS when he struck Mr. Perry, and therefore, ACS was responsible for Mr. Johnson's negligence. Counsel for ACS responded that Higher Power, who was absent from trial, was Mr. Johnson's employer, and ACS was merely a customer of Higher Power's delivery service and should not be held responsible for Higher Power's actions. Counsel stated that ACS was only a party in the case because Mr. Perry "couldn't find Higher Power."

Mr. Perry was the first witness. He testified that, on April 28, 2009, he was walking to a Weis Market near his home to purchase groceries. When he arrived at the intersection of Opossumtown Pike and Thomas Johnson Drive, he stopped at the crosswalk. After observing that the lights were green and there was no traffic turning onto Thomas Johnson

Drive in either direction, Mr. Perry stepped into the crosswalk. Mr. Perry recalled starting to cross the street, and the next thing he remembered was waking up in the hospital.

Mr. Perry spent several days at Kernan Hospital in Baltimore in the brain trauma center. He suffered numerous injuries, including a head injury, rib fractures, and a shoulder injury. After he left Kernan, he was transferred to College View Nursing Center in Frederick, where he stayed for approximately one month. At College View, he had therapy on his legs and arms. At the time of trial, Mr. Perry still had numbness in his left leg, and he suffered frequent headaches.

As a result of his injuries, Mr. Perry could not walk very far. Due to his diminished reflexes, Mr. Perry also lost his confidence to drive a car, and he gave up his cabinetwork hobby. Mr. Perry depended on friends, family, and neighbors to help him run errands. Mr. Perry recalled meeting Mr. Johnson in a courthouse and hearing him say that he was responsible for the accident.

After Mr. Perry testified, counsel for ACS again argued that evidence of Mr. Johnson's suspended driver's license and the lack of insurance on the vehicle should not be admitted because it was not relevant, and it was prejudicial. Mr. Perry argued that this evidence was relevant on the negligent hiring claim because ACS violated its own policies by failing to check whether Mr. Johnson had a valid driver's license or liability insurance before hiring him. Counsel for ACS argued, among other things, that the evidence of Mr. Johnson's lapse in insurance for nonpayment and his suspended license for a failure to

appear was not relevant to the negligent driving claim because it did not indicate that Mr. Johnson would operate a vehicle negligently.

The circuit court agreed that the evidence was not relevant to the negligence count. With respect to the negligent hiring count, however, it found that the evidence was relevant, but only if there was evidence that Mr. Johnson was ACS's agent or employee. The court stated that there were "too many factual disputes here," and before it would address the issue, Mr. Perry should call ACS's employees to establish the requisite evidentiary foundation.

Mr. Perry called Burt Maggio, President of ACS at the time of the accident. Mr. Maggio testified that ACS used dump trucks to complete work projects, i.e., to remove materials from a job site and bring materials to a job site. At one time, ACS owned its own dump trucks, but that was "very expensive," and it became more cost effective for ACS to hire truck operators to assist ACS with hauling materials for jobs.

Mr. Maggio testified that Blake Wood was the ACS employee responsible for calling truck operators to assist ACS with projects. Before Mr. Wood would hire a truck operator to assist with a project, the truck operator would contact ACS's bookkeeper and office manager "to register their vehicle and identify the company and submit all the necessary background information regarding . . . who we paid, what's the company name, tax purposes, insurance purposes." Before using a truck operator, ACS would verify that the truck operator had a tax identification number, certificates of insurance, and evidence of a license. Mr. Maggio stated that ACS would "not be allowed to" hire truck operators who did not

produce proper tax identification or insurance information, noting that, "because of the nature of the work" they did, any truck operator used by ACS "had to go through this preliminary paperwork."

ACS required proof of insurance for people or companies working on its jobs because it was often asked by its customers to provide proof of insurance. Before working at ACS, Mr. Maggio had been president of O'Leary Asphalt, another paving and concrete business. O'Leary also required individuals working on job sites to provide proof of insurance, for the same reasons ACS required proof of insurance.

On April 28, 2009, ACS was working on a play pad at St. John's Regional Church. For that job, and any other job, ACS would keep a separate file for each truck operator, with certificates of insurance or "whatever was required." On April 3, 2009, twenty-five days prior to the accident, ACS requested that Higher Power provide a revised W-9 and certificate of liability insurance to "satisfy the responsibility to make sure that they had insurance." Higher Power, however, did not provide that information, even after a second request.

ACS compensated Higher Power on an hourly basis. Mr. Maggio explained that a truck operator's starting time is "when they get to the plant . . . as soon as the supplier puts the material in their vehicle and they leave to come up to the job site, their clock starts then." A truck operator was not permitted to bring the materials from the plant to ACS's job site "whenever he . . . likes." Rather, the truck operator was expected to take direction from the superintendent or the dispatcher. After delivering a load to the ACS work site, the

superintendent or dispatcher might instruct the truck operator to return to the plant to retrieve another load and return to the site, or to return to the plant "and just sit there and I'll call you if I need you."

Mr. Maggio identified copies of checks from ACS to Higher Power. The checks indicated that the addressee was Higher Power, William Johnson, and the address was 13306 Waterfowl Way, Upper Marlboro, Maryland 20774. Mr. Johnson's motor vehicle records, which were admitted into evidence, listed that as his address. Mr. Maggio, who signed the checks, did not know who negotiated the checks, although he knew they were sent to the address on the checks.

On cross-examination, Mr. Maggio testified that, in April 2009, ACS had fifteen employees. Mr. Johnson was not an employee. Rather, he worked for Higher Power. ACS employees received a salary, health care benefits, 401(k) participation, paid holidays, and other perks. Mr. Johnson did not receive any of those benefits from ACS.

Mr. Maggio explained ACS's process for hiring "vendor[s] like Higher Power trucking." ACS would determine how many trucks it needed to complete a job and how many hours per day it needed the trucks to operate. The superintendent would then instruct the dispatcher to call hauling companies to ask whether they were available. If they were, ACS would instruct them what to do or where to go on what day. ACS used ten to fifteen hauling companies on a regular basis, based on their availability. Large hauling companies usually were not available on short notice, but the smaller companies often would "just go

-10-

and they'd line up at the [plants] in hopes that companies like [ACS] would be calling to use them to move materials to a job site." ACS did not instruct hauling companies what route they should take to get to a job site. If a truck operator wanted to go to McDonald's for lunch, take a cigarette break, or decide to do another job before ACS's job, that was up to the truck operator. The only instruction ACS gave to truck operators was where to put their material once they reached the job site. If the material delivered satisfied ACS's requirements for the day, the truck operator would be paid for the time it took to get the material from the plant to the job site, and he or she would be done for the day.

Mr. Maggio explained, however, that if a truck operator took too much time delivering material to a job site, ACS would dock the hourly pay. He gave an example of a truck driver parked at a McDonald's with an active load, in which case ACS would not pay for that time.

Mr. Perry then requested to call Officer Joseph Palkovic, a member of the City of Frederick Police Department. Counsel for ACS objected to evidence regarding "the insurance and the licensing," asserting that there still was not enough evidence to generate a jury question as to Mr. Johnson's status as an employee of ACS. The court denied the objection.

Officer Palkovic testified that he responded to the accident scene on April 28, 2009. Mr. Johnson identified himself as the driver who struck the pedestrian in the intersection. Officer Palkovic asked Mr. Johnson what happened, and Mr. Johnson responded: "'I didn't even see him.'" Upon further questioning, Officer Palkovic determined that Mr. Johnson had

a suspended driver's license, and he did not have a valid vehicle registration. Mr. Johnson did produce evidence of insurance, but Officer Palkovic's investigation revealed that the vehicle was not validly insured because of a lapse in payment. The truck that Mr. Johnson was driving was owned by Higher Power.

Mr. Wood, the project manager for ACS on the St. Johns play pad project in April 2009, testified next. In his capacity as project manager, Mr. Wood ensured that the work crew went to the right job and understood what the job entailed. He also arranged for trucking services to haul the stone and asphalt necessary to complete the project, as ACS did not own its own trucks to haul materials. When Mr. Wood did business with a trucking service, he required a certificate of insurance and a driver's license.

Prior to contacting Higher Power to haul materials for the play pad project, Mr. Wood had worked with Mr. Johnson "[q]uite a bit," i.e., "[m]ore than a dozen jobs." Mr. Wood believed that he had requested Mr. Johnson's certificate of insurance and driver's license, but the office manager would have received any paperwork in that regard. If Mr. Johnson did not provide the requested information, Mr. Wood expected that the office manager would report that information to him. Mr. Wood stated that he would not hire Mr. Johnson for work if he did not have a valid driver's license because that would be illegal and unsafe. He would not hire Mr. Johnson without a certificate of insurance because insurance is "required," and it would be illegal for Mr. Johnson not to have it.

-12-

Mr. Wood recalled that he called Higher Power, Mr. Johnson's company, to request a truck operator for the play pad project. He selected Higher Power for the project because it required only a four-hour minimum, as opposed to the six-hour minimum that other haulers required.

Mr. Wood called Mr. Johnson and told him what time he needed to be at Lafarge quarry to pick up stone. ACS, not Mr. Johnson, determined how much stone to pick up. Once Mr. Johnson picked up the materials, he was to bring them directly to ACS's job site.

After Mr. Johnson returned to the job site with a load of stone, he was required to follow the instructions of the on-site ACS employees in terms of how and where to distribute the load. Mr. Wood then instructed Mr. Johnson that he needed to go back to the quarry to pick up an additional load. Mr. Wood's expectation was that Mr. Johnson would bring the second load directly back to the job site. Mr. Johnson, who was paid on an hourly basis, was "on the clock" from the time he picked up the first load until the job was completed. Mr. Wood reserved the right to reduce the hours indicated on a driver's ticket if he felt that the driver took too long to deliver the materials to the job site.

At some point, Mr. Johnson called Mr. Wood and told him that he had been in an accident. Mr. Wood never saw Mr. Johnson work on another ACS job.

Diane Moses, a claims specialist with Progressive Insurance, testified that, on March 14, 2009, Higher Power's insurance policy on the 2007 Kenworth dump truck that

Mr. Johnson was driving had been canceled for non-payment. Ms. Moses did not see any documents indicating that Progressive advised ACS of the lapse of insurance.

Debbie Ward, plant supervisor and operations administrator with Lafarge, a supplier of construction stone, testified that, on April 28, 2009, ACS placed an order for crushed stone. Pursuant to Lafarge's tickets, which are generated when a truck picks up material from Lafarge, at 8:25 a.m. on April 28 "either ACS's truck or a truck that they used" picked up the stone. Ms. Ward believed that a Higher Power truck picked up the stone. Had ACS contacted Lafarge and asked for an order of crushed stone to be delivered, Lafarge would have used one of its independent contractors to deliver the stone. Lafarge requires its truck operators to be licensed and insured.

Prior to resting his case, Mr. Perry moved to enter into evidence certified records from SDAT indicating that Higher Power Trucking, LLC was a forfeited entity as of October 3, 2008. He also moved into evidence certified Motor Vehicle Administration records indicating that Mr. Johnson's driver's license was suspended on the date of the accident for failure to appear. The court admitted this evidence over ACS's objections.

ACS then moved for judgment, arguing that the evidence, viewed in the light most favorable to Mr. Perry, was "clear that [Mr.] Johnson . . . was not an employee, agent or servant of [ACS]." Counsel for Mr. Perry disagreed, stating:

They called [Mr.] Johnson directly. They asked him to work on this job. They agreed to pay him an hourly wage. They told him where to go, when to go, [when] to pick it up, when to bring it to the job site.

-14-

When he got to the job site, he was obligated to follow their instructions.

Counsel for Mr. Perry noted that, when the accident occurred, Mr. Johnson was getting his second load, stating that "they instructed Mr. Johnson [to] go back to the plant, get another load, and be back here in the time that we say or we're going to dock your pay. That's the right of control."

After hearing arguments, the court ruled as follows:

In determining the existence of an employment relationship, five elements/tests are considered: (1) the power to select and hire the employee; (2) the payment of wages; (3) the power of discharge; (4) the power to control an employee's conduct; and (5) whether the work is part of the regular business of the employee. And the most important test is whether the . . . employer has the right to control or direct the manner of work.

There has been evidence both ways in this case. The evidence from ACS is they can dock someone's pay if they see the person taking a break. To use the example of McDonald's, that it is very time sensitive . . . .

What the jury makes of this is entirely up to the jury. The jury has to weigh the facts, they have to decide who to believe, they have to determine the credibility of the witnesses. But if they choose to give weight to that evidence and believe there is an employment relationship, the evidence is sufficient for them to find it.

So I'm going to deny the Motion for Judgment in this case.

Heather Meador, a witness to the accident, was the sole witness for ACS. Ms. Meador testified that, as she stopped at a red light on Thomas Johnson Drive, she saw "a flash" in her peripheral vision. She then saw Mr. Perry fly in front of her truck. She stated that Mr. Perry

-15-

darted into the intersection before the dump truck turned, and he was outside of the crosswalk. She did not, however, witness the impact.

ACS then renewed its motion for judgment, making the same arguments that it made previously. The court denied the motion.

During closing arguments, ACS argued that Mr. Johnson was not its employee, but rather, he was an employee of Higher Power, an independent contractor. It noted that it did not pay Mr. Johnson wages, and it wrote checks to Higher Power.

The jury returned a verdict in favor of Mr. Perry. It found: (1) that Mr. Johnson was the agent, servant and/or employee of ACS; (2) that ACS was negligent in hiring Mr. Johnson; (3) that Mr. Johnson was negligent in operating his vehicle and that negligence was the proximate cause of Mr. Perry's injuries; and (4) that Mr. Perry was not contributorily negligent. It awarded Mr. Perry a total of $529,500, $29,500 for past medical expenses and $500,000 for pain and suffering, physical impairment, diminished quality of life, and inconveniences in the past and future.

**DISCUSSION**

**I.**

**Admission of Evidence**

ACS contends that "the circuit court erred by admitting evidence of Higher Power's lack of liability insurance, [Mr.] Johnson's suspended license and driving record and the expired registration for the dump truck." Mr. Perry asserts that Mr. "Johnson's violations of

-16-

the driver's licensing and vehicle insurance statutes constituted relevant evidence with regard to the claim of ACS's negligent hire of [Mr.] Johnson." As explained below, we agree with ACS that the lack of liability insurance was not relevant to the issues in this case, and the court erred in admitting this evidence.

## A.

## Standard of Review

We review a trial court's decision to admit evidence for abuse of discretion, but we conduct an independent analysis of whether evidence is relevant:

> "It is frequently stated that the issue of whether a particular item of evidence should be admitted or excluded 'is committed to the considerable and sound discretion of the trial court,' and that the 'abuse of discretion' standard of review is applicable to 'the trial court's determination of relevancy.' . . . Maryland Rule 5-402, however, makes it clear that the trial court does not have discretion to admit irrelevant evidence. . . . [T]he 'de novo' standard of review is applicable to the trial judge's conclusion of law that the evidence at issue is or is not 'of consequence to the determination of the action.'"

*State v. Simms*, 420 Md. 705, 724-25 (2011) (quoting *Ruffin Hotel Corp. of Md. v. Gasper*, 418 Md. 594, 619-20 (2011)). *Accord Donati v. State*, 215 Md. App. 686, 708-09, *cert. denied*, 438 Md. 143 (2014).

Relevant evidence is defined as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Md. Rule 5-401. Relevant evidence may be excluded, however, "if its probative value is substantially outweighed by the danger of unfair prejudice." Md. Rule 5-403.

-17-

**B.**

**Liability Insurance**

We begin our analysis by stating what is not in dispute. There is no dispute that the truck was not covered by liability insurance at the time of the accident.[2] There similarly is no dispute that the lack of insurance was inadmissible with respect to the negligence count. As the parties acknowledge, Md. Rule 5-411 specifically provides: "Evidence that a person was or was not insured against liability is not admissible upon the issue whether the person acted negligently or otherwise wrongfully." *Accord Morris v. Weddington*, 320 Md. 674, 680 (1990) (Ordinarily, "the matter of insurance is irrelevant to the issue of a defendant's liability and is highly prejudicial.").

There is a dispute, however, regarding whether the evidence of the lack of insurance was relevant to the claim that ACS was liable for the accident because it negligently hired Mr. Johnson. Mr. Perry argues, without citation to authority, that "[a]n employer must take reasonable steps to verify that a driver is properly insured before hiring him for a job which involves the use of the streets and highways of Maryland."

ACS contends that, in the negligent hiring context, "the lack of insurance is only admissible where it is related to the inability to acquire insurance because of the employee's

---

[2] The record contains a Certificate of Insurance that appears to have been issued to ACS the day of the accident, stating that the vehicle was insured from November 19, 2008, to November 19, 2009. There was testimony that the policy lapsed on March 14, 2009, for nonpayment, and on April 28, 2009, there was no liability coverage, but the policy was being reinstated.

incompetence as a driver." It asserts that, because there was no evidence that Mr. Johnson could not procure liability insurance because of a negative accident history or incompetence as a driver, the evidence of lack of insurance was irrelevant, and it should have been excluded.

Maryland appellate courts have made clear that an employer is obligated "to the public to use due care in selecting and retaining only competent and careful employees." *Henley v. Prince George's Cnty.*, 60 Md. App. 24, 36 (1984), *rev'd in part on other grounds*, 305 Md. 320 (1986). *Accord Jones v. State*, 425 Md. 1, 18 (2012) (when hiring an employee that is expected to come into contact with the public, the employer must make reasonable inquiry into the employee's fitness). When an employer neglects its duty to use reasonable care to hire competent employees, the employer may be liable to a third party injured by the employee. *Fid. First Home Mortg. Co. v. Williams*, 208 Md. App. 180, 198 (2012).

To determine whether the lack of insurance was relevant to the claim of negligent hiring, we must look to the elements of such a claim. As in any action for negligence, a plaintiff asserting a cause of action for negligent hiring or retention must prove duty, breach, causation, and damages. *Id.* (quoting *Cramer v. Hous. Opportunities Comm'n*, 304 Md. 705, 712-14 (1985)). The plaintiff must prove the following five elements:

(1) the existence of an employment relationship;
(2) the employee's incompetence;
(3) the employer's actual or constructive knowledge of such incompetence;
(4) the employee's act or omission causing the plaintiff's injuries; and
(5) the employer's negligence in hiring or retaining the employee as the proximate cause of plaintiff's injuries.

-19-

*Latty v. St. Joseph's Soc. of the Sacred Heart, Inc.*, 198 Md. App. 254, 272-73 (2011) (citation omitted).

Here, although various arguments were raised below, the circuit court focused primarily on the element of an employment relationship. We agree with the circuit court that sufficient evidence was elicited to submit this issue to the jury, *see infra*. With respect to whether there was evidence supporting the other elements, however, that is not so clear. In particular, we address whether the lack of insurance: (1) rendered Mr. Johnson incompetent to do the job; and (2) was the proximate cause of Mr. Perry's injuries. If not, the lack of insurance was not relevant to Mr. Perry's claim that ACS negligently hired Mr. Johnson, and the evidence should not have been admitted.

We address first whether Mr. Johnson's lack of liability insurance supported a finding that ACS hired an incompetent or unfit employee. To be sure, if Mr. Johnson's lack of insurance was due to a bad driving record, then the lack of insurance would be relevant to Mr. Johnson's competence as a driver. *See Snowhite v. State*, 243 Md. 291, 302 (1966) (evidence that employer advised employee that, if he had another accident, the company could not keep its insurance, was relevant to employer's knowledge of employee's incompetence as a driver).

Here, however, Mr. Johnson's lack of insurance was not due to any problems with his driving. Rather, it was due to lack of payment. The parties have not cited, and we have not

found, a Maryland case specifically addressing whether a lack of insurance due to financial irresponsibility is relevant to the competence of the employee.

Other courts, however, have addressed the issue. Several have held that, in addressing the competency of a contractor in a negligent hiring claim, the focus is solely on whether the contractor is competent to do the work for which he or she is hired, and financial responsibility is not relevant to the analysis.

For example, in *Mavrikidis v. Petullo*, 707 A.2d 977 (N.J. 1998), the Supreme Court of New Jersey rejected a contention that an employer was liable for the plaintiff's injuries on the ground that it hired an incompetent contractor to perform asphalt and concrete work as part of a renovation project. In that case, the plaintiff was injured when her vehicle collided with a truck hauling hot asphalt to a construction site. *Id.* at 978. In rejecting a claim that the employer of the truck driver had negligently hired an incompetent contractor, the court focused on the skills required to do the job, stating that there was no evidence that the contractor was not qualified "to perform the masonry work for which [he was] hired." *Id.* at 986. It went on to state: "A lack of insurance or lack of financial responsibility is not the equivalent or a category of incompetence," noting that "[t]he financial status of a contractor cannot be the basis for imputing liability to the principal who retained the contractor." *Id.* at 988.

Similarly, in *Huber v. Seaton*, 542 N.E.2d 464, 505 (Ill. App. Ct. 1989), the Appellate Court of Illinois addressed whether a landlord was liable for the negligence of an

-21-

independent contractor who left a valve open on a propane torch that he set down, which caused a fire. The plaintiff argued that the landlord negligently hired the contractor without checking to see if the contractor had a plumber's license or liability insurance. *Id*. at 506-07. The appellate court held that the trial court erred in advising the jury that the contractor lacked liability insurance, noting that there was nothing in the record to connect the lack of insurance with the contractor's "unfitness." *Id*. at 508. *Accord King v. Lens Creek Ltd. P'ship*, 483 S.E.2d 265, 269, 271 (W.Va. 1996) (declining to find that an independent contractor "who lacks adequate liability insurance or financial resources to respond in damages is incompetent *per se*" in a negligent hiring theory of recovery).

These cases make clear that the lack of liability insurance is not automatically relevant to the issue of the agent's competence in a negligent hiring claim. Depending on the job to be performed, however, it may be relevant.

In that regard, we find instructive the decision of the Supreme Court of New Jersey in *Puckrein v. ATI Transport, Inc.*, 897 A.2d 1034 (N.J. 2006). In that case, the Puckreins were killed when their automobile was struck by an unregistered and uninsured tractor-trailer, which went through a red light and struck the decedents' automobile. *Id.* at 1037. At the time of the accident, the tractor-trailer had been transporting a load of glass residue for Browning-Ferris Industries of New York, Inc. ("BFI-NY"), from Brooklyn, New York, to an incinerator plant in Newark, New Jersey. *Id.* BFI-NY had contracted with World

Carting Corp. ("World Carting") to transport the load, and World Carting had assigned its responsibilities to ATI Transport, Inc. ("ATI"). *Id.*

The driver of the tractor-trailer, Gaizka Idoeta, was issued summonses for, among other things, operation of an uninsured vehicle. *Id.* at 1038. ATI, as owner of the tractor-trailer, also received summonses for allowing operation of a vehicle with a suspended registration and allowing operation of an uninsured vehicle. *Id.* The plaintiffs sued several defendants, including Mr. Idoeta, ATI, and BFI-NY. *Id.* The trial court dismissed BFI-NY from the case on motion for summary judgment. *Id.*

On appeal, the issue was whether BFI-NY was vicariously liable because it engaged an "incompetent contractor." *Id*. at 1041. In addressing this issue, the court rejected the argument that its prior holding in *Mavrikidis* was that "insurance, registration, and poor financial condition are not competency issues." *Id.* at 1043. Rather, it explained its holding in *Mavrikidis* as follows:

> [T]hat Clar Pine hired a sub-contractor to pave; that the plaintiff was not injured during a badly executed paving job; that the transport of equipment and products to the job site was peripheral to the paving function; and that there was no evidence from which Clar Pine should have concluded that the Petullos were incompetent to pave.

*Id.*

In the *Puckrein* case, by contrast, "the very job" that BFI-NY hired ATI to do "was to haul waste and recyclables across state lines." Unlike in *Mavrikidis*, "transportation was not peripheral to" the BFI-NY contract, but rather, "it was the contract." *Id.* The court stated

that, under New Jersey law, "the hauler's basic competency included, at a minimum, a valid

driver's license, a valid registration certificate, and a valid liability insurance identification

card," and "[w]ithout those, the hauler has no right to be on the road at all." *Id. See*

N.J.STAT.ANN. § 39:3-29 (West 2006) ("The driver's license, the registration certificate of

a motor vehicle and an insurance identification card shall be in the possession of the driver

or operator at all times when he is in charge of a motor vehicle on the highways of this

State."); N.J.STAT.ANN. § 39:6B-1 (West 2003) ("Every owner or registered owner of a

motor vehicle registered or principally garaged in this State shall maintain motor vehicle

liability insurance coverage.").

The court held that, based on the job to be performed, existence of insurance was

relevant to the competency of the driver. *Id.* at 1043-44. It stated:

> The allegations in this case strike at the heart of the competency issue in a
> trucking case. Unlike the claims in *Mavrikidis*, licensing, registration, and
> insurance are, under our law, the *sine qua non* to the transport of goods on the
> roadways. 4 N.J.S.A. 39:3–29. Registration, concomitant to inspection, is a
> method of insuring the safety of vehicles that place the public at risk and
> insurance is the guarantee that innocent victims of errant truckers will be
> compensated. Thus, the core question was not whether World Carting was
> competent to transport BFI-NY's loads upon public highways – it was not.

*Id.* (footnote omitted).

In discussing BFI-NY's duty in hiring the hauler, the Supreme Court stated that, "[a]t

a minimum, BFI-NY was required to inquire whether its haulers had proper insurance and

registration because without those items the hauler had no right to be on the road." *Id.* at

1044. It noted that BFI-NY could not have transported products itself in unregistered and

uninsured trucks, and it stated that BFI-NY similarly was not free to engage an independent contractor that did so. *Id.* Because the record did not contain evidence that BFI-NY inquired about the contractor's competency to travel on the highways, *id.*, the Supreme Court concluded that BFI-NY was not entitled to summary judgment, and the reasonableness of its inquiry into the contractor's competency was a jury issue. *Id.* at 1045.

We find the analysis in *Puckrein* instructive. In Maryland, as in New Jersey, a person driving a vehicle is required to have liability insurance. *See* Md. Code (2012 Repl. Vol.) § 17-104 of the Transportation Article ("Transp.") (owner of motor vehicle should maintain vehicle liability insurance or other security)[3]; Transp. § 17-107 (person who knows that a vehicle is not covered by liability insurance may not: (1) Drive the vehicle; or (2) If he is an owner of the vehicle, knowingly permit another person to drive it.). *Accord Montgomery Cnty. v. Distel*, 436 Md. 226, 236 (2013) ("[T]he owner of a motor vehicle registered or required to be registered in Maryland must maintain a motor vehicle insurance policy on the vehicle.").

Similarly, here, as in *Puckrein*, Mr. Johnson was hired for the purpose of hauling materials to job sites over public highways, a job that requires liability insurance. We agree with the Supreme Court of New Jersey that, under these particular circumstances, the lack of insurance related to Mr. Johnson's competence to transport materials on public highways.

---

[3] Md. Code (2012 Repl. Vol.) §§ 17-101(d) and 17-103 of the Transportation Article provide that the security required is vehicle liability insurance or other security that provides the benefits required under Title 17.

-25-

ACS employees appeared to agree that they were "not allowed to" have truck operators who did not produce insurance information "because of the nature of the work" they did. Accordingly, under the circumstances of this case, Mr. Johnson's lack of liability insurance was relevant to whether ACS employed a competent person.

That, however, is not the end of the inquiry. To be relevant to the claim of negligent hiring, the employer's negligence in hiring someone with no liability insurance must be the proximate cause of Mr. Perry's injuries. Counsel for Mr. Perry argues that the evidence supports such a finding because, if ACS had not breached its duty to check whether Mr. Johnson had insurance, it would have discovered that he did not have insurance, it would not have hired him, and the accident would not have occurred. In making this "but for" argument, counsel misapprehends the concept of proximate cause.

This Court has explained that "'[p]roximate cause consists of two elements: (1) cause in fact and (2) legally cognizable cause.'" *Wankel v. A&B Contractors, Inc.*, 127 Md. App. 128, 158 (quoting *May v. Giant Food, Inc.*, 122 Md. App. 364, 383(1998)), *cert. denied*, 356 Md. 496 (1999). We explained that "causation in fact raises the threshold question of 'whether the defendant's conduct *actually* produced an injury.'" *Id.* (quoting *Peterson v. Underwood*, 258 Md. 9, 17 (1970)). Two tests are used to determine whether cause in fact exists, "the 'but for' test and the 'substantial factor test.'" *Id.* (quoting *Yonce v. SmithKline Beecham Clinical Lab. Inc.*, 111 Md. App. 124, 138 (1996)). The "'but for' test applies when the injury would not have occurred in the absence of the defendant's negligent act."

*Yonce*, 111 Md. App. at 138. The "substantial factor" test appears when "two independent causes concur to bring about an injury, and either cause, standing alone, would have wrought the identical harm." *Id.*

With respect to legal cause, however, the Court "asks whether the defendant, in light of 'considerations of fairness and social policy,' should be held liable for the injury, even when cause in fact has been established." *Wankel*, 127 Md. App. at 159 (quoting *Peterson*, 258 Md. at 16). We explained:

> "[A]lthough an injury might not have occurred 'but for' an antecedent act of the defendant, liability may not be imposed if . . . the negligence of one person is merely passive and potential, while the negligence of another is the moving and effective cause of the injury, or if the injury is so remote in time and space from defendant's original negligence that another's negligence intervenes." [*Peterson*, 258 Md. at 16].
>
> The question of legal causation often involves a determination of whether the injury was foreseeable. As we stated in *May:* "A person will not be relieved of liability for a negligent act if, at the time of that act, the person 'should have foreseen the "general field of danger," not necessarily the specific kind of harm to which the injured party would be subjected as a result of the [person's] negligence.' " *May*, 122 Md. App. at 384 (citations omitted).

*Id.*

In determining whether harm is foreseeable, Maryland appellate courts have adopted the view set forth in RESTATEMENT (SECOND) OF TORTS § 435 (1965) concerning proximate causation. *Wankel*, 127 Md. App. at 159. *Accord Bd. of Co. Comm'rs of Garrett Cnty. v. Bell Atlantic-Maryland, Inc.*, 346 Md. 160, 184 (1997); *Henley*, 305 Md. at 334. That section states, in pertinent part, as follows:

-27-

**Foreseeability of Harm or Manner of Its Occurrence**

(1) If the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent him from being liable.

(2) The actor's conduct may be held not to be a legal cause of harm to another where after the event and looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinary that it should have brought about the harm.

RESTATEMENT (SECOND) OF TORTS § 435 (1965).

Thus, the question in this case is whether there was evidence that ACS's action in hiring a driver without liability insurance was a proximate cause of Mr. Perry's injuries. In that regard, we are guided by decisions of other courts, which have held that, to be liable for negligent hiring, the employee's particular unfitness must be the cause of the harm.

In *McFarland & Son, Inc. v. Basel*, 727 So.2d 266 (Fla. Dist. Ct. App. 1999), the issue was whether McFarland & Son, Inc., was liable for an accident cause by its employee, Jonathon McQueen, when he was driving an eighteen-wheel car carrier. Mr. Queen, who had a valid commercial driver's license, had not completely filled out his employment application, which was in violation of Interstate Commerce Commission regulations, and the plaintiff's expert testified that, because of that violation, Mr. Queen should not have been driving on the night of the accident. *Id.* at 268. The expert admitted, however, that the failure to fill out the application did not cause the accident. *Id.* The court held that,

"[w]ithout proof of a causal connection between the regulatory restriction and the incident, the finding of liability based on a regulatory deficit is unsustainable." *Id.* at 269.

Similarly, in *Guillermo v. Brennan*, 691 F. Supp. 1151, 1157-58 (N.D. Ill. 1988), the United States District Court for the Northern District of Illinois held that, to be liable for negligent hiring, an employee's alleged unfitness must be "directly and obviously related to the way in which the third party was harmed." *Id.* at 1158. In that case, the employer hired Brennan as an insulation installer without investigating his background. *Id.* at 1153. The installer was driving the employer's vehicle while intoxicated, when he collided with another vehicle. *Id.*

In addressing the claim of negligent hiring, the court stated that, even assuming that the employer breached its duty in hiring the installer, there was no evidence that an investigation would have indicated that the installer had a propensity for using the vehicle in a negligent manner, and therefore, no "plausible causal link between [the installer's] alleged deficiencies as a prospective or actual employee and the accident." *Id.* at 1157. Because there was no evidence that the installer's alleged unfitness was related to his wrongdoing in the accident, there was no evidence that any negligence in hiring the installer was proximate cause of the injury.

In *Detrick v. Midwest Pipe & Steel, Inc.*, 598 N.E.2d 1074 (Ind. Ct. App. 1992), the Court of Appeals of Indiana reached a similar conclusion, although it specifically addressed the lack of insurance as it relates to proximate cause in a negligent hiring case. In that case,

Robert Shaw, an independent contractor for Midwest Trucking, Inc., killed a person after he disregarded a stop sign while consulting a road map. *Id.* at 1076. Neither Mr. Shaw, nor Midwest Trucking possessed an intrastate or interstate commerce operating authority permit. *Id.* The court addressed whether Midwest Pipe & Steel, Inc., was liable on the ground that it negligently employed Midwest Trucking and Mr. Shaw. *Id.* at 1081. Noting that Midwest Pipe & Steel "failed to ascertain that Midwest Trucking trucks were adequately insured or operated pursuant to appropriate intrastate or interstate operating authority," the court stated that "a lack of due care may be conceded." *Id.* It held, however, that "the conduct must be the proximate cause of the harm upon which a claim is based before liability may be imposed," and a "lack of permits and adequate liability insurance has no causal connection to Detrick's injury." *Id.* Accordingly, it affirmed the grant of summary judgment in favor of Midwest Pipe & Steel. *Accord Stone v. Pinkerton Farms, Inc.*, 741 F.2d 941, 947 (7th Cir. 1984) (lack of liability insurance had no causal connection to negligence of independent contractor who caused accident while hauling soybeans the accident); *Huber*, 542 N.E.2d at 467 (Hubers failed to establish "any relationship between lack of insurance and the negligent act of [the contractor]" in leaving the propane torch valve open).

Although many of these cases addressing proximate cause in a negligent hiring claim involve the propriety of a grant of summary judgment, the Supreme Court of Texas applied the same analysis in addressing the admissibility of evidence. In *TXI Transportation Company v. Hughes*, 306 S.W.3d 230 (Tex. 2010), the claim was that TXI Transportation

negligently hired Mr. Rodriguez, who subsequently collided with another vehicle while driving a tractor-trailer loaded with gravel. *Id.* at 233. The court admitted evidence that Mr. Rodriguez was an illegal immigrant and had made several misrepresentations regarding his immigration status to obtain his Texas commercial driver's license and his employment with TXI Transportation. *Id.* at 233-34.

In finding that it was prejudicial error to admit that evidence, the Texas Supreme Court noted that, in the negligent hiring context, a plaintiff must show that the risk that caused the hiring to be negligent also proximately caused the plaintiff's injuries. *Id.* at 240. The court held that Mr. "Rodriguez's immigration status did not cause the collision, and was not relevant to the negligent entrustment or hiring claims – even if TXI's failure to screen, and thus its failure to discover his inability to work in the United States, 'furnished [the] condition' that made the accident possible." *Id.* at 241. In other words, "'neither Rodriguez's status as an illegal alien or his use of a fake Social Security number to obtain a commercial driver's license created a foreseeable risk that Rodriguez would negligently drive the gravel truck.'" *Id.* (citation omitted).[4]

In line with these authorities, we hold that, to generate a claim for negligent hiring, there must be evidence that the contractor's alleged unfitness was directly related to the way the injured party was harmed. Here, it was not Mr. Johnson's lack of insurance coverage that

---

[4] This Court previously addressed whether immigration status is relevant in a personal injury action, stating that it was irrelevant on the question of liability, but relevant to a claim of lost wages. *Ayala v. Lee*, 215 Md. App. 457, 478 & n.16 (2013).

caused the accident. Rather, it was Mr. Johnson's negligent driving that caused Mr. Perry's injuries and damages. Because there was no causal link shown between Mr. Johnson's lack of insurance due to nonpayment and the accident, the lack of insurance was not relevant to the claim of negligent hiring. And given the potential prejudice that results from the admission of evidence of insurance, *see Morris*, 320 Md. at 681, the admission of the evidence requires reversal of the judgment for Mr. Perry.[5]

## II.

## Denial of Motion to Dismiss Initial Complaint

ACS next contends that the court erred in denying its motion to dismiss Mr. Perry's initial complaint because Count I of the complaint failed to state a claim against ACS, as it did not allege that Mr. Johnson was ACS's agent, servant, or employee, and it did not allege that he was operating the dump truck within the scope of employment with ACS or that ACS had the right to control Mr. Johnson. Therefore, it asserts, because Count I stated a claim only against Higher Power, the court erred in denying its motion to dismiss.

With respect to Count II, negligent hiring and supervision, ACS asserts that Mr. Perry alleged that Higher Power employed Mr. Johnson, and therefore, Higher Power had the obligation to make sure that Mr. Johnson had a valid driver's license and insurance on the

___

[5] Because it may not arise in a new trial, we do not address the admissibility of evidence of Mr. Johnson's license and registration status.

-32-

dump truck. Accordingly, ACS asserts, the initial complaint stated a claim only against Higher Power.

Mr. Perry responds that ACS's motion to dismiss the initial complaint is moot. He notes that the court granted his Motion for Leave to File an Amended Complaint, which superceded the initial complaint, and renders this issue moot. We agree.

An amended complaint supersedes the initial complaint, rendering the amended complaint the operative pleading. *Gonzales v. Boas*, 162 Md. App. 344, 355, *cert. denied*, 388 Md. 405 (2005). The amended complaint replaces the initial complaint in its entirety, and the initial complaint is considered withdrawn. *Shapiro v. Sherwood*, 254 Md. 235, 238-39 (1969).

Here, after learning through discovery that Higher Power was a forfeited limited liability company, Mr. Perry filed a Motion for Leave to File an Amended Complaint, which alleged that ACS, not Higher Power, was Mr. Johnson's employer. The court granted his motion and the trial proceeded on the amended complaint. Because we have determined, *see infra*, that this was appropriate, the propriety of the court's denial of ACS's motion to dismiss the initial complaint is moot. *See Turner v. Kight*, 192 F. Supp. 2d 391, 397 (D.Md. 2002) (denying as moot a motion to dismiss an original complaint when an amended complaint was filed, superseding the original complaint), *aff'd on other grounds*, 121 Fed. Appx. 9 (4th Cir. 2005).

**Grant of Motion for Leave to Amend Initial Complaint**

ACS next contends that the court abused its discretion in granting Mr. Perry's motion for leave to amend his initial complaint, allowing him to file a first amended complaint less than two weeks before trial. It asserts that Mr. Perry's discovery that Higher Power was a forfeited limited liability company at the time of the accident was not a basis to allow the amended complaint because this forfeiture only affected Higher Power's ability to transact business or maintain a lawsuit "in the name" of the limited liability company, but it did not make Higher Power nonexistent or affect its ability to be sued or defend an action. ACS argues that allowing the amended complaint was prejudicial because it "effectively gutted ACS'[s] theory of the case," i.e., that Mr. Johnson was employed by Higher Power, not ACS. It asserts that, because the jury could not consider whether Higher Power was liable for Mr. Johnson's negligence, "it was quite clear to the jury that it had to find ACS liable in order for [Mr.] Perry to be compensated in this case."

ACS further contends that the amended complaint, which alleged for the first time that Mr. Johnson was an employee of ACS, was a "new cause of action." Because the accident occurred on April 28, 2009, and the Amended Complaint was not filed until October 4, 2013, ACS asserts that the Amended Complaint was filed more than seventeen months after the three-year statute of limitations expired.

Mr. Perry contends that the circuit court properly granted his motion to file an amended complaint. He asserts that the amended complaint "did not add any new legal theories or causes of action and did not change the operative fact pattern," i.e., that "the operator of the truck which struck Mr. Perry was acting as the agent, servant and/or employee of ACS at the time of the collision." He disagrees with ACS's argument that allowing the amended complaint "gutted" ACS's theory of the case, pointing to numerous instances during the trial where ACS argued that Higher Power was an independent contractor and the actual employer of Mr. Johnson. Finally, with respect to the argument that the amended complaint was barred by the statute of limitations, Mr. Perry asserts that the allegations in the amended complaint related back to the initial complaint, which was filed within the limitations period, and therefore, the amended complaint was not time-barred.

Maryland Rule 2-341(c) provides that "[a]mendments shall be freely allowed when justice so permits." In *Hartford Accident and Indemnity Company v. Scarlett Harbor Associates Limited Partnership*, 109 Md. App. 217 (1996), *aff'd on other grounds*, 346 Md. 122 (1997), we explained that the decision to "grant leave to amend rests within the discretion of the trial court," which considers that leave to amend "'should be generously granted'" but not "if the amendment would result in prejudice to the opposing party or undue delay." *Id.* at 248 (quoting *Thomas v. Ford Motor Credit Co.*, 48 Md. App. 617, 632 (1981)). As long "'as the operative factual pattern remains essentially the same, and no new cause of action is stated invoking different legal principles,'" amendments to pleadings are to be

allowed freely and liberally. *Id.* (quoting *Gensler v. Korb Roofers, Inc.*, 37 Md. App. 538, 543 (1977)). It is a "'rare situation' in which the granting of leave to amend is not warranted." *Id.* at 249. *Accord Tabor v. Baltimore City Pub. Schs*, 138 Md. App. 747, 754 (2001).

Here, we agree with Mr. Perry that the amended complaint did not change the operative fact pattern or state a new cause of action. As the circuit court stated, the amended complaint merely reflected Mr. Perry's discovery that Higher Power Trucking, LLC "was simply a trade name."

With respect to ACS's argument that it was prejudiced by the amendment because it "gutted" ACS's theory of the case, we are not persuaded. ACS argued throughout the trial that Mr. Johnson's "actual employer" was Higher Power, and that Higher Power was an independent contractor.[6]

We address next ACS's argument that the amended complaint was barred by the statute of limitations. In that regard, we note that, "'if the factual situation remains

---

[6] ACS also argues that Higher Power's forfeited status did not justify an amendment because it affected only Higher Power's right to do business in the state, not "the relationship between ACS and Higher Power" or its ability to be sued. We note, however, that this argument was not made to the circuit court. Indeed, ACS argued the opposite, that the original complaint against Higher Power, as an agent of ACS, was a nullity because a complaint filed against a forfeited corporation is a nullity, which does not toll the statute of limitations. Because the argument made on appeal was not raised below, we will not consider it. *See* Md. Rule 8-131(a) ("Ordinarily, the appellate court will not decide any . . . issue unless it plainly appears by the record to have been raised in or decided by the trial court.").

essentially the same after the amendment as it was before it, the doctrine of relation back applies and the amended cause of action is not barred by limitations.'" *Walls v. Bank of Glen Burnie*, 135 Md. App. 229, 238 (2000) (quoting *Nam v. Montgomery Cnty.*, 127 Md. App. 172, 186 (1999)).  In other words, when a claim "'relates back' to the date of filing of the original complaint, limitations are measured from the date of the accrual of the cause of action to the date of filing of the original complaint."  *Walls*, 135 Md. App. at 238 (citing *Myers v. Aragona,* 21 Md. App. 45, 51 (1974)).  Because, as we have stated, the amended complaint did not add any new legal theories or causes of action and did not change the operative fact pattern, the amendment related back to the initial complaint, which was filed within the limitations period.  The circuit court properly exercised its discretion in granting Mr. Perry's motion for leave to file an amended complaint.

## IV.

### Denial of Motion for Judgment

ACS's last contention is that it was "entitled to judgment as a matter of law on the respondeat superior claim" because it merely supervised Mr. Johnson's loading and unloading of his truck, which was insufficient to rebut the presumption that Mr. Johnson was "the servant of Higher Power, who owned the dump truck he was operating at the time of the accident."  With respect to the negligent hiring claim, ACS asserts that it was entitled to judgment as a matter of law because there was no evidence of an employment relationship between ACS and Mr. Johnson, and the evidence of Mr. Johnson's "alleged incompetence,"

i.e., his suspended license for failing to appear in court and a lapse of insurance for non-payment, were not relevant to his competence or ability to operate a motor vehicle safely.

Mr. Perry contends that the circuit court properly denied ACS's motion for judgment. He asserts that the issue whether Mr. Johnson was the agent and/or servant of ACS at the time of the accident was a factual issue for the jury, and there was overwhelming evidence to support the decision to send that issue to the jury. In particular, Mr. Perry points to evidence that ACS controlled Mr. Johnson at each end of the haul, directed how he loaded and unloaded the truck, paid him an hourly wage, and reserved the right to dock his pay or discharge him for any reason.

With respect to the negligent hiring claim, Mr. Perry notes that ACS does not challenge each element of a claim for negligent hiring, but rather, it contests only the existence of an employment relationship and Mr. Johnson's alleged incompetence. He asserts that there was sufficient evidence for the jury to find an employment relationship and that Mr. Johnson was not a competent employee without a valid driver's license, insurance, or vehicle registration.

The standard for reviewing a circuit court's ruling on a motion for judgment is well settled.

> [W]e ask whether on the evidence adduced, viewed in the light most favorable to the non-moving party, any reasonable trier of fact could find the elements of the tort by a preponderance of the evidence. . . . If there is even a slight amount of evidence that would support a finding by the trier of fact in favor of the plaintiff, the motion for judgment should be denied.

-38-

*Washington Metro. Area Transit Auth. v. Djan*, 187 Md. App. 487, 491-92 (2009).

We begin our analysis with the negligence count. Pursuant to the doctrine of *respondeat superior*, an employer may be found liable for torts committed by its employee while acting in the scope of employment. *Fid. First Home Mortg.*, 208 Md. App. at 201-02. ACS does not dispute this well-established rule, but it argues that the evidence showed that Mr. Johnson was not its employee.

The Court of Appeals has set forth the applicable analysis in determining whether an employer/employee relationship exists:

> [Maryland courts have] traditionally considered five criteria in determining whether or not an employer/employee relationship exists between two parties. These criteria, developed from the common law standard for determining the master/servant relationship, *see Sun Cab* [*Co. v. Powell*, 196 Md. 572, 577 (1951)], include (1) the power to select and hire the employee, (2) the payment of wages, (3) the power to discharge, (4) the power to control the employee's conduct, and (5) whether the work is part of the regular business of the employer[.] *Mackall v. Zayre Corp.* [293 Md. 221, 230 (1982)].
>
> Of the five factors, the factor of control stands out as the most important. We have said, for example, that whether the employer "has the right to control and direct the employee in the performance of the work and in the manner in which the work is to be done" is the "decisive," *Mackall, supra,* 293 Md. at 230, or "controlling" test[.] *L. & S. Construction* [*Co. v. State Acc. Fund*, 21 Md. 51, 57 (1959)]; *Keitz v. National Paving Co.,* 214 Md. 479, 491 (1957).

*Whitehead v. Safway Steel Prods., Inc.*, 304 Md. 67, 77-78 (1985) (parallel citations omitted). *Accord Chevron, U.S.A., Inc. v. Lesch*, 319 Md. 25, 33 (1990) ("[t]he decisive test in determining whether the relation of master and servant exists is whether the employer has

the *right to control and direct the servant in the performance of his work and in the manner in which the work is to be done*").

If a party produces any legally sufficient evidence to prove the existence of an agency or employment relationship, it becomes a question of fact that must be submitted to the fact finder. *Rivera v. Prince George's Cnty. Health Dep't*, 102 Md. App. 456, 479 (1994). *Accord S. Mgmt. Corp. v. Taha*, 378 Md. 461, 481 n.6 (2003) (whether an individual is an employee generally is a question for the jury); *Great Atl. & Pac. Tea Co. v. Imbraguglio*, 346 Md. 573, 590 (1997) ("Ordinarily, the existence of the employer/employee relationship is a question reserved for the fact finder.").

Here, the record contained sufficient evidence to support the court's decision to deny ACS's motion for judgment on the negligence claim and submit the case to the jury. As Mr. Perry notes, the evidence indicated as follows: (1) ACS called Mr. Johnson directly to reserve his trucking services; (2) Mr. Wood spoke only to Mr. Johnson when calling Higher Power; (3) ACS directed Mr. Johnson to go to the Lafarge quarry to pick up materials for the play pad project and gave him the time to be there for the pick-up; (4) Mr. Johnson was required to bring the materials directly to the job site after his truck was loaded, and if Mr. Johnson did not deliver the materials promptly, ACS had the right to dock his pay or to no longer employ him; (5) ACS paid Mr. Johnson on an hourly basis from the time he picked up his first load until ACS dismissed him from the job site; (6) after Mr. Johnson delivered his first load of materials, ACS directed him to return to the quarry to pick up and bring back

additional materials; and (7) at the job site, Mr. Johnson was obligated to follow ACS's directions in terms of where to drop the materials, how much material to drop, and how many times he would need to return to the quarry. Based on that evidence, a jury could find that Mr. Johnson was subject to ACS's control, and ACS was liable for Mr. Johnson's negligence pursuant to the doctrine of *respondeat superior*. *See Keitz*, 214 Md. at 493 (evidence sufficient to support sending to the jury the issue whether truck driver was the servant of a paving company at the time of the accident, even though he was employed by the owner of the truck).

With respect to the negligent hiring claim, we previously set forth the five elements required for a plaintiff to prevail on a negligent hiring claim. ACS contests only two of those elements, the existence of an employment relationship and Mr. Johnson's purported incompetence. As we have discussed, there was sufficient evidence for the jury to find in favor of Mr. Perry on both those elements. The circuit court properly denied ACS's motion for judgment.

**JUDGMENT REVERSED. CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID 75% BY APPELLANT, 25% BY APPELLEE.**